611 S.E.2d 250

In the Matter of the ESTATE OF Mary Frances PALLISTER.

Ann Garman Diem Patton, as personal representative of
the Estate of Ruth Eleanor Diem, Respondent,

v.

James E. Reames, Stephen L. Reames, Marsha R. Bozard,
and David S. Reames, as personal representative of
the Estate of F.S. Reames, Appellants.

No. 25960.

Supreme Court of South Carolina.

Heard Feb. 15, 2005.

Decided March 28, 2005.

Rehearing Denied April 20, 2005.

438

John R. Chase, of Haynsworth Sinker Boyd, P.A., of Florence, and B. Eric Shytle, and Sarah P. Spruill, both of Haynsworth Sinkler Boyd, P.A., of Columbia, for Appellants.

Kenneth B. Wingate and Paul D. Kent, of Sweeny, Wingate and Barrow, P.A., of Columbia, for Respondent.

Justice BURNETT.

This is a lost or missing will case. A probate court jury found that Ann Patton, personal representative of the Estate of Ruth Eleanor Diem, proved by clear and convincing evidence Mary Frances Pallister (Testatrix) did not destroy her original last will and testament with an intent to revoke it.[1] The circuit court affirmed the verdict and Appellants, the nephews and niece of Testatrix, appeal. We certified this case for review from the Court of Appeals pursuant to Rule 204(b), SCACR, and now affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Testatrix died April 7, 2001, at the age of 89, leaving an estate with an estimated, after-tax value of $1.4 million. Testatrix's husband predeceased her and she left no children.

The parties agreed Testatrix was competent to execute the last will and testament dated October 22, 1999, the will in issue, but litigated the question whether the will was revoked by Testatrix because the original document could not be found after Testatrix's death. Ruth Eleanor Diem (Diem), the primary beneficiary to the will, was the sister of Testatrix's husband. Patton, a contingent beneficiary in the will, is Diem's daughter. James Reames (James) and the other Appellants are the children of Testatrix's two brothers.

James is a contingent beneficiary in the will, but will not take under it because Diem survived Testatrix. James and the other Appellants would inherit Testatrix's estate if the will

---

1. The jury rendered a verdict in favor of Ruth Eleanor Diem, Patton's mother, who originally petitioned the probate court to accept the will and appoint her as Testatrix's personal representative. Diem testified at trial. After Diem died, Patton was substituted in her place as personal representative of Diem's estate.

is deemed destroyed with an intent to revoke, such that intestacy laws apply.

Testatrix executed two wills while living in New Mexico. The primary and contingent beneficiaries named in Testatrix's 1983 will were her husband, Diem, and Patton. The 1983 will named these same persons as personal representatives in the same order of priority.

The primary and contingent beneficiaries named in Testatrix's 1997 will, prepared after her husband's death, were Diem, Patton, and Testatrix's sister-in-law, Lola Reames, wife of Testatrix's brother and mother of James. The 1997 will named these same persons as personal representatives in the same order of priority.

Diem and Patton lived in California, while Testatrix lived in New Mexico during the last two decades of her life. Testatrix and Diem were close friends for fifty-five years, staying in touch through visits, joint vacations, telephone calls, cards, and letters. Diem was Testatrix's matron of honor at her 1946 wedding. Patton and Testatrix maintained a similar, close relationship.

Testatrix, who grew up in Bishopville, S.C., moved from New Mexico to South Carolina in 1998. The will in issue was prepared by a South Carolina attorney and executed on October 22, 1999.[2] In this will, Testatrix named as her primary and contingent beneficiaries Diem, Patton, and James, a Florence resident. The 1999 will named these same persons as personal representatives in the same order of priority. Testatrix told her accountant in South Carolina she planned to leave her estate to Diem and Patton, i.e., her husband's side of the family, to honor the memory of her husband and his efforts. He was the primary breadwinner and his earnings and investment acumen resulted in an estate which afforded Testatrix a comfortable lifestyle.

---

2. The 1999 will contained the usual language revoking all prior wills and codicils. The parties agree the 1999 will was valid upon execution. If Testatrix subsequently revoked the 1999 will, that revocation would not revive a prior will absent clear, cogent, and convincing evidence Testatrix intended to revive the prior will. See S.C.Code Ann. § 62-2-508 (1987). The record contains no such revival evidence, therefore, Testatrix's estate would be distributed under intestacy laws if the 1999 will was revoked.

After moving to South Carolina, Testatrix placed Diem and Patton as joint-signatories on her bank accounts and granted them right of access to her safe deposit box. About a month after executing the 1999 will, Testatrix signed a durable power of attorney naming Diem s her agent, with Patton as alternate agent, in financial and other matters. On the date she executed the 1999 will, Testatrix signed a health care power of attorney naming James as her agent for health care decisions if she were to become mentally incompetent.

Testatrix, by all accounts, was a "delightful," "organized" woman who knew her own mind and did not hesitate to express her wishes and opinions. The attorney who prepared the 1999 will testified she discussed various types of trusts with Testatrix, but Testatrix desired only a simple will. The attorney delivered the original will to Testatrix and encouraged her to place it in a safe deposit box.

Testatrix's tax accountant testified Testatrix was an organized, "by the books" person. Administrators at the Methodist Manor, where Testatrix lived, described her, although she had some physical frailties, as "organized," "on the ball," "very sharp mentally," and an "independent, private person." Diem, Patton, and James offered similar testimony. Such testimony referred to witnesses' general knowledge of Testatrix during the years they knew her and was not necessarily focused on the last weeks of her life.

Testatrix was generous to close relatives. From 1996 to 1999, Testatrix gave, in cash or assets such as stocks and bonds, $183,000 to Patton, $30,000 to Diem, and $104,000 to James. In addition, Testatrix made a business loan of $100,000 to James in 2000, although James apparently considered it a gift, not a loan.

While living at the Methodist Manor in Florence, Testatrix gradually developed a close relationship with James and his family. James visited and helped Testatrix at her home at least once or twice a week. Testatrix sometimes had dinner at James' home. James testified he visited Testatrix at her home or in the hospital every day during the last several weeks of her life as her health worsened, at times spending most or all of the day with her. A nurse assistant, who sat with Testatrix at the hospital on the evening of her death and

who did not know the family, testified Testatrix repeatedly asked for James during the final hours of her life.

James testified he knew where Testatrix kept financial records at her home, including her bank and brokerage accounts, and he sometimes filed financial documents for her. Testatrix kept extensive financial records from years past. James helped Testatrix sort her mail, but did not discard anything without her permission. At trial James initially denied helping Testatrix with her financial or business matters in the final months of her life. When confronted with his conflicting deposition testimony, James testified he wrote checks for Testatrix and sometimes even signed her name. He carried a bag, containing Testatrix's checkbooks and investment records, for Testatrix while taking her to and from the hospital in the last weeks of her life.

James testified he had a key to Testatrix's Methodist Manor apartment "from day one." He also had the keys to her car, which he testified she gave him several months before her death. The record shows, however, the title never had been transferred by Testatrix's signature. James, a car salesman for thirty-two years, testified that although he was "in the used car business . . . I do not do title work."

He further testified Testatrix gave him a copy of the 1999 will some time following its execution. He saw the will a second time two to three months before Testatrix's death in January or February 2001, lying on a table in her apartment. On that occasion, he picked it up when it fell on the floor with some books and replaced it on the table. He testified he did not know what happened to the original 1999 will and denied discarding or destroying it.

Testatrix was hospitalized with congestive heart failure and related health problems for eight days in March 2001 and from April 5 until her death on April 7, 2001. In the last month of her life, Testatrix and part of her belongings were moved from her independent living unit to an assisted living unit at the Methodist Manor.

On April 4, 2001, James asked a bank officer to contact Testatrix at her apartment. The bank officer testified she spoke with Testatrix by telephone and, at Testatrix's direction, prepared forms to add James to Testatrix's checking and

money market accounts on which Diem and Patton already were listed as joint signatories. The bank officer also prepared a form allowing James to enter Testatrix's safe deposit box.

James obtained an account transfer form from Testatrix's brokerage firm on April 4. James asked a brokerage representative to accompany him to the Methodist Manor to assist his aunt in completing the form, but the representative was unable to leave the office.

James took the bank and brokerage forms to Testatrix's apartment. He testified Testatrix, who was using an oxygen tank, signed the forms in the presence of a notary public, who was a Methodist Manor employee; an unidentified "sitter" who was staying with Testatrix that afternoon; and an unidentified, older woman who was a Manor resident and friend of Testatrix's. Signing the forms consumed about half an hour. The notary public later testified that only he, Testatrix, and James were in the apartment when the forms were signed during a five-minute period.

James returned to the bank and brokerage firm the same afternoon. James transferred $80,000 from Testatrix's joint bank accounts to his individual account. He transferred Testatrix's brokerage account, worth about $633,000, to his individual brokerage account.[3]

On the morning of April 5, 2001, James entered Testatrix's safe deposit box for the first time. He testified he did so out of "curiosity" and to search for the health care power of attorney form which had been requested by her doctor in order to admit Testatrix to the hospital. James and his wife testified they could not find the form Testatrix had given James because many of their belongings were in storage while they built a new home. James testified he again entered Testatrix's safe deposit box after her death on April 9, 2001, in the presence of a bank officer, to retrieve vehicle-related documents.

---

3. The parties tried only the issue of whether the 1999 will had been lost by mistake or destroyed with an intention to revoke it. The jury heard evidence, but did not decide the validity, of James' transfers of Testatrix's assets to himself.

Patton testified she and Diem first learned on April 10, 2001, about James' transfer of assets to himself and his entries into Testatrix's safe deposit box. Patton testified she and Diem, following Testatrix's death, could not find the original 1999 will in Testatrix's safe deposit box or among her belongings or other financial documents. When they finally spoke to James by telephone after several attempts to reach him since arriving, he told them he had never seen Testatrix's will. Patton and Diem visited Testatrix's apartment and found it in an uncharacteristically messy and unkempt state.

Testatrix had kept her previous wills in a safe deposit box. The record is unclear whether Testatrix ever entered her safe deposit box after executing her last will on October 22, 1999. The last date signed by Testatrix on the record of entry form was partially scratched out or written over. A bank officer testified the ambiguous number may be an "8" or a "9" and appears to show Testatrix last entered the box on "9–13–99," although the date is uncertain.

Patton testified she and Diem found an empty envelope marked "Last Will and Testament" when they entered Testatrix's safe deposit box on April 10, 2001. The attorney who prepared Testatrix's 1999 will, however, testified the envelope was not similar to ones she used in such matters.

James testified he was "concerned" when he first saw the 1999 will and "didn't understand why it was the way it was when [Testatrix] had charged me with certain other responsibilities." The attorney who prepared the will testified James expressed his anger about the will provisions to her in a telephone call shortly after the will had been prepared. James said he was upset the entire estate was left to Diem or Patton, while he was burdened with helping Testatrix with health care and other matters without getting anything from the estate. The attorney testified James accused her, wrongfully, of advising Testatrix to draft such a will. James' brother, Stephen Reames, testified at his deposition James told him—after he had transferred Testatrix's assets to himself—James had "got his inheritance from [Testatrix]." Stephen testified at trial he could not recall whether James used the word "gift" or "inheritance" in describing the transferred assets.

## ISSUES

I. Did the circuit court err in affirming the jury's verdict because Patton failed to present clear and convincing evidence rebutting the presumption Testatrix had destroyed her original will, which could not be found after her death, with an intent to revoke it?

II. Did the circuit court err in affirming the probate court's refusal to instruct the jury on the principle that a person is never presumed to commit a crime?

## STANDARD OF REVIEW

An action to contest a will is an action at law. *Johnson v. Johnson*, 235 S.C. 542, 546, 112 S.E.2d 647, 649 (1960); *Golini v. Bolton*, 326 S.C. 333, 338, 482 S.E.2d 784, 787 (Ct.App.1997). If the proceeding in the probate court is in the nature of an action at law, the circuit court and the appellate court may not disturb the probate court's findings of fact unless a review of the record discloses there is no evidence to support them. *Matter of Howard*, 315 S.C. 356, 361, 434 S.E.2d 254, 257 (1993); *Townes Assocs., Ltd. v. City of Green-ville*, 266 S.C. 81, 221 S.E.2d 773 (1976); *In re Estate of Weeks*, 329 S.C. 251, 262, 495 S.E.2d 454, 460 (Ct.App.1997). Under the Probate Code, a circuit court hearing an appeal from the probate court must apply the same rules of law as an appellate court would apply on appeal. *Matter of Howard*, 315 S.C. at 360–61, 434 S.E.2d at 256–57; S.C.Code Ann. § 62–1–308 (Supp.2004).

An appellate court will not reverse the trial court's decision regarding jury instructions unless the trial court abused its discretion. *Clark v. Cantrell*, 339 S.C. 369, 389, 529 S.E.2d 528, 539 (2000). An abuse of discretion occurs when the trial court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support. *Fontaine v. Peitz*, 291 S.C. 536, 538, 354 S.E.2d 565, 566 (1987).

## LAW AND ANALYSIS

### I. EVIDENCE SUPPORTING JURY'S VERDICT

Appellants contend the probate and circuit courts erred in denying their directed verdict and post-trial motions for a

judgment in their favor as a matter of law. Appellants argue Patton failed to present clear and convincing evidence rebutting the presumption Testatrix had destroyed her will with an intent to revoke it because the original document could not be found after her death. Appellants argue "there is not a scintilla of evidence of a cause, other than revocation, for the Will's disappearance." We disagree.

A will is an expression of a testator's intent to dispose of the testator's property after death. A will may be freely modified or revoked by a mentally competent testator, acting of the testator's own volition, until the testator's death. *Lowe v. Fickling,* 207 S.C. 442, 447, 36 S.E.2d 293, 294 (1945); S.C.Code Ann. 62–2–506 (1987) (revocation of will by writing or act).

"When a testator takes possession of his [original] will and the same cannot be found after his death, the law presumes the testator destroyed it animo revocandi, i.e., with an intent to revoke it. This is merely a presumption of fact and may be rebutted by the evidence the will existed at the time of his death, was lost subsequent thereto, or had been destroyed by another without authority to do so. The same presumption arises where it is shown the testator, while not having the will in his actual possession, had ready access to it." *Lowe,* 207 S.C. at 447, 36 S.E.2d at 294–95; *Bauskett v. Keitt,* 22 S.C. 187, 191 (1885); *Golini v. Bolton,* 326 S.C. 333, 340, 482 S.E.2d 784, 787–88 (Ct.App.1997); *In re Estate of Mason,* 289 S.C. 273, 277, 346 S.E.2d 28, 31 (Ct.App.1986).

Consequently, the person attempting to rebut the presumption and submit a copy of the lost or missing will to the probate court for administration must present clear and convincing evidence (1) the original will existed at the time of the testator's death and (2) the original will was lost after his death or destroyed by a third party without the testator's knowledge or consent. *Lowe,* 207 S.C. at 447, 36 S.E.2d at 294–95; *Golini,* 326 S.C. at 340, 482 S.E.2d at 788; *Estate of Mason,* 289 S.C. at 277, 346 S.E.2d at 31.

The person contesting the validity of a will usually bears the burdens of proof and persuasion. *Golini,* 326 S.C. at 340, 482 S.E.2d at 787; S.C.Code Ann. § 62–3–407 (Supp.

2004). However, these burdens are reversed in cases of lost or missing wills. The person asserting that an original will was, in fact, valid but mistakenly lost or destroyed by another, bears the burden of presenting clear and convincing evidence to rebut the presumption the testator destroyed the will with an intent to revoke it. *Lowe*, 207 S.C. at 451, 36 S.E.2d at 296; *Golini*, 326 S.C. at 340, 482 S.E.2d at 788.

 The mere fact a person who would benefit from destruction of a will possessed it or had access to it, standing alone, is not sufficient to rebut the presumption the testator himself revoked the will by destroying it. *Lowe*, 207 S.C. at 448, 36 S.E.2d at 295. However, "[p]roof that a testator, whose will cannot be found after death, entertained a kindly or loving feeling toward the beneficiaries under the Will carries weight and tends toward the conclusion of nonrevocation of the Will by the testator." *Golini*, 326 S.C. at 342, 482 S.E.2d at 788–89.

 We conclude Patton presented clear and convincing evidence from which a jury could determine the original 1999 will existed at the time of Testatrix's death, and it was either lost after her death or destroyed by a third party without her knowledge or consent. Accordingly, we affirm the jury's vedict in favor of Patton.

It is undisputed the 1999 will was valid upon execution. The attorney testified she delivered the original will to Testatrix and James testified he saw it in her apartment two to three months before her death. The primary and first contingent beneficiaries of the will were the same persons Testatrix had named in her wills since 1983—Diem and Patton. The record contains no evidence Testatrix expressed any desire to change or revoke her will in order not to pass assets to Diem and Patton; nor is there any evidence Testatrix grew unhappy or displeased with them in any way. The record contains clear and convincing evidence upon which the jury may have relied in determining the original will existed at Testatrix's death.

Testatrix previously had kept her wills in a safe deposit box. She may have placed the 1999 will in her box, although it is unclear due to the ambiguous date on the bank's record of entry form. Regardless, Testatrix usually was an organized,

"by the books" person who regularly maintained files containing current and past financial and investment documents. Some of those documents were transported in a bag to and from the hospital on several occasions in the month preceding her death. Some of her belongings were moved from an independent living unit to an assisted living unit at the Methodist Manor in the last weeks of her life. Diem and Patton found Testatrix's apartment in an unusually disorganized and unkempt state after her death.

In addition, Testatrix regularly had consulted professionals—lawyers, accountants, and stock brokers—throughout her life when making important decisions and preparing significant documents. The jury may have reasoned that if Testatrix had wanted to revoke her 1999 will, it is not likely she would have torn it up or discarded it. Instead, it is far more likely she would have consulted the lawyer who had drafted the will to make other arrangements. The record contains clear and convincing evidence upon which the jury may have relied in determining the original 1999 will was misplaced or lost during Testatrix's final illness and frequent moves.

Moreover, James knew about the will and admitted he was displeased with its terms. He telephoned Testatrix's attorney to complain about it and accused her of convincing Testatrix to leave everything to Diem and Patton. He had unfettered access to Testatrix's apartment, knew where she kept financial and investment records, and by his own testimony spent days on end there as Testatrix's health worsened. He had access to Testatrix's apartment for eleven days while she was hospitalized shortly before her death.

The mere fact James, who would benefit financially were the will revoked, had access to Testatrix's missing will is not, standing alone, sufficient to rebut the presumption Testatrix herself revoked it by destroying it. However, in addition to the evidence of Testatrix's practice of keeping careful records and consulting professionals, the record reveals more than motive to destroy the will and opportunity to do so by a third party.

James acted decisively to ensure he received, using the word ascribed to him by his brother, his "inheritance" from Testatrix. James transferred about $713,000 in assets from

Decedent to himself on the day she re-entered the hospital—three days before her death—after obtaining her signature on necessary bank and brokerage forms.

James testified several people were in the room during a half-hour signature session. The notary public testified only he, James, and Testatrix were present during a five-minute period. When questioned by Diem and Patton about the transfers and the location of Testatrix's original 1999 will after Testatrix's death, James told them he had never seen the will. The record contains clear and convincing evidence upon which the jury may have relied in determining a third party destroyed the will without Testatrix's consent or knowledge.

## II. JURY INSTRUCTION

Appellants contend the probate court erred in refusing to give the following instruction to the jury: "The law does not presume that a will has been destroyed by another person without the knowledge or consent of the maker, for this would be a crime under the laws of South Carolina and a crime is never presumed." Appellants argue the charge, drawn from *Lowe*, 207 S.C. at 447, 36 S.E.2d at 295, was necessary to ensure the jury understood its verdict could not be based on speculation the will was destroyed by a third person. We disagree.

The probate court, accepting Testatrix's arguments against the charge, rejected it because use of the term "crime" was inflammatory and potentially placed too much weight n one method of rebutting the presumption a missing will was destroyed by the Testatrix with an intent to revoke it.

 A trial court must charge the current and correct law. McCourt by *McCourt v. Abernathy*, 318 S.C. 301, 306, 457 S.E.2d 603, 606 (1995). The law to be charged to the jury is determined by the evidence at trial. *State v. Hill*, 315 S.C. 260, 262, 433 S.E.2d 848, 849 (1993). In reviewing jury charges for error, appellate courts must consider the charge as a whole in light of the evidence and issues presented at trial. *Keaton ex rel. Foster v. Greenville Hosp. Sys.*, 334 S.C. 488, 497, 514 S.E.2d 570, 575 (1999). A jury charge is correct if, when read as a whole, it contains the correct definitions and adequately covers the law. *Id.* at 495–96, 514 S.E.2d at 574; *In re McCracken*, 346 S.C. 87, 94, 551 S.E.2d 235, 239 (2001).

It is not error for the trial judge to refuse a specific request to charge when the substance of the request is included in the general instructions. *Varnadore v. Nationwide Mut. Ins. Co.*, 289 S.C. 155, 160, 345 S.E.2d 711, 715 (1986).

We conclude the probate court judge properly instructed the jury on the law governing lost wills, the rebuttable presumption a testator destroyed his will with an intent to revoke if it cannot be found after his death, and Patton's burden to rebut the presumption by clear and convincing evidence. When read as a whole, the charge correctly defined and adequately covered the law. Moreover, Appellants' specific request to charge was included in the general instructions. The probate court judge did not abuse his discretion in refusing the requested charge.

## CONCLUSION

We affirm the decision of the circuit court and thereby affirm the verdict of the probate court jury. Patton may present a copy of Testatrix's 1999 will to the probate court for administration despite the loss of the original will.

AFFIRMED.

MOORE, A.C.J., WALLER, PLEICONES, JJ., and Acting Justice L. CASEY MANNING, concur.