THIS OPINION HAS NO PRECEDENTIAL VALUE

THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS 
 PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
Martha Melton Williams, Betty C. Rapp, John Fisher, and Joanne Santoro, Individually and as Personal Representative of the Estate of Adelaid W. Fisher,
Appellants/Respondents,
v.
James W. Weaver, Individually and as Personal Representative of the Estate of Wiley James
McKain, Jr.; Joe Dunn; Emily P. Cooper; Janie P. Jones; Joe Reed a/k/a Joe Reed Powell, Jr.; Edith Carroll a/k/a Eddie Carroll
Brisendine; Jean Badger a/k/a Jean B. Lynn; Sara B. Vann a/k/a Sara B. Graham; Ben Badger, Jr.; Elise Badger; Rhett G. Pitts; Deedie B. Daniels; Mary Badger; Sallye Badger; Amy B. Williams; Betsy B. Langdon; Alston Badger a/k/a Alston Badger, Jr.; Wilbur Cagle; Nancy T. Wyman; and as Defendants whose names are unknown, any spouse, child or children, heirs-at-law or distributees of Wiley J.
McKain, deceased, and all persons entitled to claim under or through him, together with right, title, or interest under or through him, together with all other persons unknown claiming any right, title or interest in or lien upon the Estate of Wiley J.
McKain, deceased or any property are assets thereof, any unknown adults being as a class designated as John Doe and any unknown infants or persons under disability being as a class designated as Richard Roe,
Defendants,
of whom Wilbur Cagle is, Respondents/Appellant
and
James W. Weaver, Individually and as Personal Representative of the Estate of Wiley James
McKain, Jr.; Joe Dunn; Emily P. Cooper; Janie P. Jones; Joe Reed a/k/a Joe Reed Powell, Jr.; Edith Carroll a/k/a Eddie Carroll
Brisendine; Jean Badger a/k/a Jean B. Lynn; Sara B. Vann a/k/a Sara B. Graham; Ben Badger, Jr.; Elise Badger; Rhett G. Pitts; Deedie B. Daniels; Mary Badger; Sallye Badger; Amy B. Williams; Betsy B. Langdon; Alston Badger a/k/a Alston Badger, Jr.; Nancy T. Wyman; and as Defendants whose names are unknown, any spouse, child or children, heirs-at-law or distributees of Wiley J.
McKain, deceased, and all persons entitled to claim under or through him, together with right, title, or interest under or through him, together with all other persons unknown claiming any right, title or interest in or lien upon the Estate of Wiley J.
McKain, deceased or any property are assets thereof, any unknown adults being as a class designated as John Doe and any unknown infants or persons under disability being as a class designated as Richard Roe are,
Respondents.
 
 
 

Appeal From Georgetown County
 Benjamin H. Culbertson, Master in Equity

Unpublished Opinion No.2006-UP-314
Submitted June 1, 2006  Filed August 3, 2006   

AFFIRMED

 
 
 
Robert L. Widener and Robert W. Dibble, both of Columbia, for Appellant-Respondents
David W. Keller, John Ravenel Chase, John Rogers Kirven, all of Florence; and John H. Tiller, of Charleston, for Respondents
Kenneth L. Mitchum, of Georgetown, for Respondent-Appellant
 
 
 

PER CURIAM:  Martha Williams, Betty Rapp, and other relatives of the late Wiley J. McKain, Jr. filed a petition to set aside McKains 1998 will on the grounds of undue influence and lack of testamentary capacity.  The Master-in-Equity upheld the contested will.  This appeal followed.  We affirm.[1]     
FACTS
On December 29, 2001, Wiley J. McKain, Jr. died at the age of 90.   McKains Last Will and Testament, dated July 9, 1998 (the 1998 Will), was submitted to probate.  The 1998 Will bequeathed all of McKains property, including approximately 735 acres along the Black River in Georgetown County valued at around $4,000,000, to James Weaver, a long-time friend. 
By all accounts, McKain was an eccentric person.  McKain resided on his Black River property in living accommodations that were primitive and unhygienic.  He originally lived in a wood-sided shack with no running water.  Later he lived in trailers, which he also kept in unsanitary conditions.  
Despite his eccentric way of life, McKain appeared to have lived the life he wanted.  He dearly loved his Black River property and rarely left.  Indeed, McKains Black River property was his life.  His primary source of income was derived from the rental of lots and timber sales from his property.  McKain came to know many of his tenants well through encounters that would occur on his frequent walks, or as he called them stretches, around his property.  McKain had a proclivity for telling outlandish stories.  For example, McKain frequently commented about large alligators living around his property.  He often used this topic as a signal that he was ready to end a conversation.    
In 1971, McKain was involuntarily committed to the state mental hospital.  McKain contested his commitment and was discharged in less than sixty days.  Attorney Thomas E. Smith, Jr., represented McKain in contesting his commitment.         
In 1991, Rapp, McKains niece, became concerned about McKains mental and physical health.  Specifically, Rapp was afraid the Wymans, tenants who supposedly helped run McKains property, were taking advantage of McKain.  Rapps concerns led her to ask Dr. Theodore Gagliano to examine McKain.  On October 5, 1991, Dr. Gagliano examined McKain and concluded McKain was gravely disabled and incompetent both as to person and estate.  Based on Dr. Gaglianos findings, Rapp filed an action petitioning the probate court to have guardians and conservators appointed for
McKain.  
On October 8, 1991, the probate court appointed Rapp as temporary guardian and appointed Dr. Gagliano to reexamine McKain.  A deputy with the Georgetown Sheriffs office brought McKain to Dr. Gaglianos office for a second examination on October 15, 1991.  Dr. Gagliano found McKains thinking was grossly flawed and his conclusions [were] invalid being based on delusions, projections and other distortions of ideation.  Gagliano further opined that McKain suffered from Schizophrenia, paranoid type, chronic moderate, complicated by Primary degenerative dementia of the Alzheimer type, senile onset; was actively psychotic; had grossly defective judgment; was incompetent as to both person and estate; and these disorders were chronic and irreversible.  After a hearing, the probate court issued an order continuing Rapp as McKains temporary guardian during the pendency of the action for a permanent guardian and conservator.  
McKain subsequently contested the appointment of Rapp as his guardian and conservator.  In February 1992, the parties reached a compromised settlement, and the probate court appointed Alston C. Badger, a relative and an attorney, and H. McRoy Skipper, a local CPA, as co-guardians and co-conservators.  The probate courts order specifically provided McKain agrees by reasons of advanced age, that he lacks the ability to effectively manage all of his affairs without assistance . . . .  
As a result of the various actions taken against him, McKain came to hold some resentment toward his relatives.  McKains tenuous relationship with his relatives was common knowledge as he was often visibly upset after visiting with some family members.  Moreover, McKain executed a Last Will and Testament in 1991 (the 1991 Will), leaving 100 acres of his Black River property to non-relatives, the Wymans, and notably excluding Rapp and Williams.  
In contrast, McKain grew fonder of Weaver over the years.  Weaver and McKain first met in December 1972 when Weavers father-in-law, Stanley White, inquired about renting property along the Black River.  Over the years, Weaver visited the Black River property often and developed a close personal relationship with
McKain.  
In March 1993, McKain, through Smith, filed a motion requesting the removal of Badger and Skipper as co-guardians and co-conservators.  Subsequently, Skipper resigned as co-guardian and co-conservator, and McKain agreed to withdraw his petition to terminate the guardian and conservatorship if Weaver could be named co-guardian and co-conservator.  By order dated March 28, 1994, the court gave effect to this agreement.  Thereafter, Badger generally tended to McKains financial affairs and Weaver tended to McKains day-to-day care.                    
In May 1995, McKain became ill.  Weaver took him to see a doctor, who ordered McKain to be hospitalized.  When McKain was released from the hospital a week later, Weaver invited McKain to live with Weaver and his wife, Genevieve Weaver.  
For the next three years, McKain lived in the Weavers home.  The Weavers considered McKain a family member and included him in their daily lives, family meals, and holiday gatherings.  Weaver also took McKain to visit his Black River property a couple of times.  McKain developed a fondness for his new home and even informed relatives that the Weavers home was the best place he ever lived.  
In late 1994 or early 1995, McKain contacted Smith about revising his will.[2]  In June 1995, Smith visited McKain in the hospital and discussed the preparation of a new will with him.  Smith prepared McKains will shortly following the hospital visit; however, the will was not executed at that time.  
On July 9, 1998, Weaver drove McKain to Smiths office to execute a new will.  Smith discussed the contents of McKains will with McKain in private; Weaver, at Smiths request, left the office.  After discussing the wills contents, McKain took a five minute stretch in front of Smiths office; McKain was not approached by anyone during his stretch.  Thereafter, McKain signed the will that is the subject of this action.  The 1998 Will is identical to the will Smith prepared in June 1995.  
In December 1998, McKain fell and broke his hip on the Weavers property.  McKain was hospitalized for about a week and then moved to a rehabilitation center.  A couple of weeks later McKain moved to Commander Nursing Home, where he remained until he died on December 29, 2001.  
McKains 1998 Will was submitted to probate and McKains relatives (collectively Contestants) filed this action to set aside the 1998 Will on the grounds of undue influence and/or incapacity.  This action was filed against Weaver and all other parties entitled to claim under or through McKain, including the late Wilbur Cagle, who alleged he was McKains biological son and potential intestate heir.  The probate court transferred the case to the circuit court, which referred the case to the Master-in-Equity for Georgetown County.  After a hearing, the master issued an order upholding the validity of the 1998 Will.  Contestants filed motions pursuant to Rule 52 and Rule 59, which were summarily denied.  Cagle also filed motions pursuant to Rule 52 and Rule 59 alleging the master lacked subject matter jurisdiction to determine paternity. The master summarily denied Cagles motions.  Contestants and Cagle appealed.       
STANDARD OF REVIEW
An action to contest a will is an action at law.  In re Estate of Pallister, 363 S.C. 437, 447, 611 S.E.2d 250, 256 (2005).  On appeal from an action at law that was
tried without a jury, the appellate court can correct errors of law, but the findings of fact will not be disturbed unless found to be without evidence which reasonably supports the judges findings.  Blackmon v. Weaver, 366 S.C. 245, 249, 621 S.E.2d 42, 44 (Ct. App. 2005).
LAW/ANALYSIS
I.   Testamentary Capacity 
Contestants argue McKain lacked testamentary capacity to execute the 1998 Will.  We disagree. 
The opponent of a will bears the burden of proving a lack of testamentary capacity.  See S.C. Code Ann. § 62-3-407 (Supp. 2005).  The test of capacity necessary to make a will is whether the testator knew his estate, the objects of his affections and to whom he wished to give his property. 
Hembree v. Estate of Hembree, 311 S.C. 192, 195, 428 S.E.2d 3, 4 (Ct. App. 1993). 
Moreover, the presumption arises upon proof of due execution of the will that the testator knew its contents and this is sufficient to establish testator knowledge thereof.  Id.  [T]he capacity to know or understand, rather than the actual knowledge or understanding, is sufficient.  In re Estate of Weeks, 329 S.C. 251, 263, 495 S.E.2d 454, 461 (Ct. App. 1997) (quoting 94 C.J.S. Wills § 15(c) (1956)).  This test for determining whether or not a person has sufficient mental capacity to dispose of his property by will does not include the proviso that he must have a reasonable basis on which to found his like or dislike of the natural objects of his bounty.  Id.  The fact alone that the testator disposed of property contrary to what others usually consider fair is not sufficient to declare his will void.  Hellams v. Ross, 268 S.C. 284, 290, 233 S.E.2d 98, 101 (1977).  Indeed, the right to make a will carries with it the right to disregard what the world considers a fair disposition of property.  Id. 
We find the evidence in the record supports the masters finding of capacity.  First, the evidence establishes that McKain knew his estate consisted of his Black River property.  Several of McKains tenants provided testimony that demonstrates McKain had intimate knowledge of his property, including knowledge of the boundaries, the survey markers, and the size and location of plats.  Moreover, before signing the 1998 Will, McKain informed Smith the will may not accurately reflect the actual size of his property because some of his land had been washed away by the river.  
Second, the record supports a finding that McKain knew the objects of his affection.  The record indicates that, although he was not always cordial, McKain recognized his relatives when they visited.  In addition, prior to executing the will, McKain further demonstrated knowledge of his relatives by explaining to Smith, I cant trust [my property] with [my relatives], [Weaver] will do what I want done.  McKains statement to Smith indicates McKain was aware of who his relatives were and was aware he was not leaving his property to his family.  Additionally, the evidence demonstrates McKain was aware he was devising his estate to Weaver.  As noted above, he specifically stated Weaver would manage the property as McKain would want.  McKain also questioned whether he should leave some property to one of Weavers sons-in-law, but eventually decided Weaver could make that decision at a later point in time.  Smith testified he believed McKain was competent to make a will on the day of execution.  
We note evidence concerning McKains reduced capacity to manage his affairs and eccentricity is not sufficient proof to invalidate the 1998 Will.  The probate courts appointment of co-conservators and co-guardians for McKain has no effect on the capacity of the protected person, except to the extent the order affects his estate or affairs.  S.C. Code Ann. § 62-5-408(4) (1987).  Moreover, Dr. Gaglianos finding McKain suffered from Schizophrenia, paranoid type, chronic moderate, complicated by Primary degenerative dementia of the Alzheimer type, senile onset and was incompetent as to both person and estate in 1991 is not dispositive because a prior determination of insanity is not conclusive and even an insane person may execute a will if it is done during a sane interval.  Weeks, 329 S.C. at 264, 495 S.E.2d at 461.  
Further, the accounts of McKains untidy and primitive living accommodations and eccentricity, including his suspicions of his relatives and his tendency to tell tall tales, are not sufficient to invalidate the 1998 Will.  [E]ccentricities, peculiarities, or deviation or departure from normal conduct do not of themselves render a person incompetent to make a will.  95 C.J.S. Wills § 12 (2001).  A persons mind is presumed to be sound until the contrary is clearly proved no matter how great any eccentricity.  Weeks, 329 S.C. at 264, 495 S.E.2d at 461.
Based on the above, we find the record provides ample evidence to establish McKain knew his estate, the objects of his affection, and to whom he wished to give his property.  Accordingly, we find the master did not err in concluding McKain did not lack testamentary capacity to execute the 1998 Will.  
II.   Undue Influence
Contestants next contend the 1998 Will was invalid based on undue influence.  We disagree. 
In order for a court to invalidate a will for undue influence, the influence must be the kind of mental coercion that destroys the free agency of the testator and constrains him to do things that are against his free will, and that he would not have done if he had been left to his own judgment and volition.  Russell v. Wachovia Bank, N.A., 353 S.C. 208, 217, 578 S.E.2d 329, 333 (2003).  If the testator had the testamentary capacity to dispose of his property and was free and unrestrained in his volition at the time of making the Will, the influence that may have inspired it or some provision of it will not be undue influence.  Last Will and Testament of Smoak, 286 S.C. 419, 424, 334 S.E.2d 806, 809 (1985).  The mere existence of undue influence is not enough to vitiate a Will.  Russell, 353 S.C. at 217, 578 S.E.2d at 333.  A mere showing of opportunity and even a showing of motive to exercise undue influence does not support a claim for undue influence unless there is additional evidence that such influence was actually utilized.  Id.  General influence is not enough.  A contestant must show that the influence was brought directly to bear upon the testamentary act.  Mock v. Dowling, 266 S.C. 274, 277, 222 S.E.2d 773, 774 (1976).  
As with the issue of testamentary capacity, once formal execution of a will is admitted or proved, a prima facie case in favor of the will is made out, and the burden is then on the contestants to prove undue influence.  S.C. Code Ann. § 62-3-407 (Supp. 2005).   As a general rule, the party challenging an instrument on the basis of undue influence must present evidence that unmistakenly and convincingly shows the partys will was overborne by the defendant or someone acting on his behalf.  Macauley v. Wachovia Bank of S.C., 351 S.C. 287, 299, 569 S.E.2d 371, 378 (Ct. App. 2002).  However, when a confidential relationship exists, a presumption of undue influence arises.  Howard v. Nasser, 364 S.C. 279, 288, 613 S.E.2d 64, 68-69 (Ct. App. 2005).  [A]lthough the proponents of the will must present evidence in rebuttal, they do not have to affirmatively disprove the existence of undue influence.  Instead, the contestants of the will still retain the ultimate burden of proof to invalidate the will.  Id. at 288, 613 S.E.2d at 68-69; see § 62-3-407 (Parties have the ultimate burden of persuasion as to matters with respect to which they have the initial burden of proof.).  Undue influence must be shown by unmistakable and convincing evidence, which is usually circumstantial.  Russell, 353 S.C. at 217, 578 S.E.2d at 333.     
As Weaver was serving as McKains guardian at the time of the execution of the 1998 Will, a presumption of undue influence arises.  However, there is ample evidence in the record to reasonably support a finding that McKains 1998 Will was not procured by undue influence.  Certainly, as the master found, McKains relation to Weaver was far more friendly, amicable and trusting than his relations with the other parties to this action.  McKain and Weaver had a long-term friendship that began in the early 1970s and lasted until McKains death.  Also, in the final years of McKains life, Weaver and his family treated McKain as part of their family: taking him into their home for three years, caring for him, including him in their daily lives and holidays, and regularly visiting him in the hospital and nursing home.  McKain even noted that the Weavers home was the best place he ever lived.  In contrast, McKain was only periodically visited by his relatives and, over the years, grew more and more resentful of them.    
Furthermore, though McKain resided with Weaver from 1995 through 1998, the evidence does not demonstrate Weavers influence ever rose to the level of force or coercion.  McKain waited three years and had multiple meetings with Smith before executing his new will.  Furthermore, Weaver was not present at the time McKain executed his will.  In addition, McKains relatives were not restricted from visiting McKain at the Weavers.    
Accordingly, we find the evidence supports the masters finding that the 1998 Will was not a product of undue influence.   
III.   Motion to Reopen the Record 
Contestants assert the master erred in refusing to reopen the record based on the evidence that twelve days after the briefing scheduled for the post-trial motions in this case, Smith appeared as counsel of record for Weaver in another case involving Wilbur Cagle versus Weaver, individually and as personal representative of McKains estate.  Contestants allege Smiths representation of Weaver gives greater credibility to their theory that Smith and Weaver conspired to unduly influence McKain.  We disagree. 
The decision whether to reopen a record for additional evidence is within the trial courts sound discretion and will not be disturbed on appeal absent an abuse of that discretion.  Wright v. Strickland, 306 S.C. 187, 188, 410 S.E.2d 596, 597 (Ct. App. 1991).  In Last Will and Testament of Smoak, 286 S.C. 419, 334 S.E.2d 806 (1985), the supreme court held a directed verdict should have been granted in favor of the beneficiary on the issue of undue influence where the beneficiarys own attorney drafted the contested will.  We fail to see how evidence of Smiths subsequent representation of Weaver would make any difference to the outcome of this case.  Therefore, we find the master did not commit an abuse of discretion in refusing to reopen the record based on evidence Smith was representing Weaver in a separate action.  
IV.   Paternity of Cagle 
Respondent/Appellant Wilbur Cagle, now deceased, alleged he was McKains biological son and potential intestate heir.  Cagles personal representative contends the master lacked subject matter jurisdiction to make findings regarding paternity of Cagle.  As we have upheld the validity of the 1998 Will, which disposed of McKains entire estate, we find Cagles argument that he is a potential intestate heir is moot.  See Byrd v. Irmo High School, 321 S.C. 426, 431, 468 S.E.2d 861, 864 (1996) (stating a case becomes moot when a judgment, if rendered, would have no practical legal effect upon the existing controversy, thus making it impossible for the reviewing court to grant effectual relief).     
CONCLUSION
For the above stated reasons, the decision of the master is   
AFFIRMED. 
HUFF, STILWELL, and BEATTY, JJ. concur.  

[1] We decide this case without oral argument pursuant to Rule 215, SCACR.
[2] McKain purportedly revoked the 1991 Will in July 1995.  The validity of McKains revocation of the 1991 Will was not ruled upon by the master and is not before this court.