743 S.E.2d 746

Alan WILSON, in his capacity as Attorney General of the State of South Carolina; Daryl J. Brown, on behalf of his minor children, Lindsey B. and Janise B.; Deanna J. Brown Thomas, on behalf of her minor child, Jason L.; Yamma N. Brown, on behalf of her minor children, Sydney L. and Carrington L.; Tonya B.; Vanisha Brown; Larry Brown; Tommie Rae Hynie Brown; and James B., through his Guardian ad Litem, Respondents,

v.

Albert H. DALLAS, Alfred A. Bradley, and David G. Cannon, Individually and as (purported) Trustees of the James Brown 2000 Irrevocable Trust; Adele J. Pope and Robert L. Buchanan, Jr., Personal Representatives of The Estate of James Brown and Trustees of the James Brown 2000 Irrevocable Trust; Terry Brown; Romunzo Brown; Forlando Brown; Cinnamon N.M. Paris; LaRhonda Petitt; Jeanette Mitchell; and Russell L. Bauknight, as Special Administrator and Special Trustee for The Estate of James Brown and The James Brown 2000 Irrevocable Trust, Defendants,

of whom Robert L. Buchanan, Jr. and Adele J. Pope, as Personal Representatives of The Estate of James Brown and Trustees of The James Brown 2000 Irrevocable Trust are, Appellants,

and

Albert H. Dallas, Alfred A. Bradley, and David G. Cannon, Individually and as (purported) Trustees of The James Brown 2000 Irrevocable Trust; Terry Brown; Romunzo Brown; Forlando Brown; Cinnamon N.M. Paris; LaRhonda Petitt; Jeanette Mitchell; and Russell L. Bauknight, as Special Administrator and Special Trustee for The Estate of James Brown and The James Brown 2000 Irrevocable Trust are, Respondents.

In re The Estate of James Brown and The James Brown 2000 Irrevocable Trust u/a/d August 1, 2000.

Appellate Case No. 2009–142286.

No. 27227.

Supreme Court of South Carolina.

Heard Nov. 1, 2011.

Refiled May 8, 2013.

Rehearing Denied May 8, 2013.

James B. Richardson, Jr., of Columbia, and Tressa T.H. Hayes, of Asheville, NC, for Appellants.

Attorney General Alan Wilson, Senior Assistant Attorney General C. Havird Jones, Assistant Deputy Attorney General Robert D. Cook, Assistant Attorney General J.C. Nicholson, III, Assistant Attorney General Mary Frances Jowers, all of Columbia; Louis Levenson, of Atlanta; Matthew Day Bodman, of Columbia; Robert N. Rosen, of Charleston; David L. Michel, of Charleston; S. Alan Medlin, of Columbia; T. Hey-

ward Carter, Jr., of Evans Carter Kunes & Bennett, of Charleston; William W. Wilkins, of Nexsen Pruet, of Greenville; and J. David Black and Fred L. Kingsmore, Jr., both of Nexsen Pruet, of Columbia, for Respondents.

Albert P. Shahid, Jr., of Charleston, for the Guardian ad Litem.

Justice BEATTY.

Robert L. Buchanan, Jr. and Adele J. Pope ("Appellants"), formerly personal representatives for The Estate of James Brown and trustees of The James Brown 2000 Irrevocable Trust, appeal from circuit court orders that (1) approved a settlement agreement pursuant to S.C.Code Ann. § 62–3–1102 (2009) of pending litigation concerning the estate; and (2) removed Appellants from their fiduciary positions and appointed Russell L. Bauknight as personal representative and trustee. We affirm in part, reverse in part, and remand.

## I. FACTS

James Brown ("Brown"), a singer and entertainer known as "The Hardest–Working Man in Show Business" and "The Godfather of Soul," died in Atlanta, Georgia on December 25, 2006. Brown left an estate widely estimated to be worth anywhere from $5 million to over $100 million that is at the heart of this dispute among numerous parties.

By will dated August 1, 2000, Brown devised all of his personal and household effects to six adult named children: Deanna J. Brown Thomas, Yamma N. Brown, Vanisha Brown, Daryl J. Brown, Larry Brown, and Terry Brown. Brown left the remainder of his estate to The James Brown 2000 Irrevocable Trust via a pour-over provision in his will.

Brown created the 2000 Irrevocable Trust under a separate agreement, also dated August 1, 2000, as part of his estate plan to provide financial assistance for the education of his grandchildren and disadvantaged youths. The agreement creating the 2000 Irrevocable Trust includes Schedule A, which indicates Brown placed his long-time residence at Beech Island, Aiken County, and other assets in the trust as part of its initial funding, although the record contains some discrepancies as to the timing of the transfers.

Albert H. Dallas, Alfred[1] A. Bradley, and David G. Cannon were named as the co-personal representatives of Brown's estate and as the co-trustees of the 2000 Irrevocable Trust. In the trust document, Brown created an Advisory Board, initially to be comprised of three members, who were to confer with and advise the trustees in a manner consistent with Brown's objectives for the trust. There were also provisions regarding trustee succession, which required three trustees to serve at all times.

Upon Brown's death, the principal and income contained in the 2000 Irrevocable Trust, as augmented by Brown's general estate, was to be divided, by its terms, into two "shares" or subtrusts: (1) The Brown Family Education Trust ("Family Trust"), which was capped in the amount of $2 million for tax purposes and designated for the education of Brown's grandchildren; and (2) The James Brown "I Feel Good" Trust ("Charitable Trust"), which Brown declared "shall be used solely for the tuition, educational expenses, and financial assistance of ... poor and financially needy children, youth, or young adults (Who are both qualified and deserving) who seek and have need of such assistance to obtain and further their education at the many educational entities and/or institutions available in the States of South Carolina and Georgia." Thus, Brown's estate planning documents indicate Brown intended the bulk of his wealth to be used to support the Charitable Trust.

Brown's will and trust each contained a no-contest clause, which provided that any beneficiary who challenged the will or the 2000 Irrevocable Trust "shall forfeit his or her entire interest thereunder." Brown noted in both documents that the persons described therein, i.e., the six named children and their legitimate issue, comprised "the entire class ... acknowledge[d] to be [his] heirs and issue." Brown expressly disavowed any other potential beneficiaries, stating, "I have intentionally failed to provide for any other relatives or other

---

1. Bradley's first name also appears as "Alford" in various documents in the record, including Brown's will and trust. We further note variations exist in the record regarding the spelling of the names of Vanisha Brown (also "Venisha") and Tommie Rae Hynie Brown (also "Tomi Rae Hynie" and "Tommie Rae Hyne"). The names herein are as they appear in the case caption presented to this Court.

persons, whether claiming, or to claim, to be an heir of mine or not." Brown stated any person not provided for in his will or trust "whether or not claiming to be a beneficiary, party in interest, or otherwise shall not have standing or be qualified to contest, claim an interest in or otherwise dispute the disposition of [his] estate as he herewith disclaims and disinherits any such person." Brown stated that any challenge by such persons to the disposition of his estate or the validity of the documents would "be considered an affront to [his] wishes," and "shall be vigorously challenged as such by his fiduciaries." In the trust agreement, Brown declared that he was not then married and that he did not want the trust estate to ever go to a spouse: "It is the Grantor's [Brown's] intention that the trust estate be available only to the beneficiaries and not ... the Grantor's past or future spouse. The Trustee(s) are directed to enforce this provision."

Thereafter, on November 27, 2001, Brown and Tommie Rae Hynie ("Tommie Rae") executed a Prenuptial Agreement in which Tommie Rae acknowledged that she was entering the agreement knowingly and voluntarily and that she had the opportunity to receive the advice of counsel of her own choosing. Tommie Rae waived any right to Brown's property or the receipt of alimony in the event of a separation or divorce from Brown, and she agreed to waive any claim for an interest in his estate in the event of his death, including the rights to a statutory share of Brown's estate or to any interest as an omitted spouse.

On December 14, 2001, Brown and Tommie Rae participated in a marriage ceremony in Aiken County. In 2004, Brown brought annulment proceedings against Tommie Rae after discovering that she had participated in a marriage ceremony in Texas in 1997 with another individual, Javed Ahmed. Brown attached documents to his pleadings showing Tommie Rae had not been granted an annulment of the prior marriage until April 15, 2004. Tommie Rae counterclaimed for a divorce from Brown on the ground of physical cruelty, and in his reply, Brown sought genetic testing of a son, respondent "James B.," born to Tommie Rae on June 11, 2001. The parties dismissed their respective suits in a consent order filed August 16, 2004, in which Tommie Rae agreed to "forever waive any claim of a common law marriage to [Brown], both

now and in the future." The parties thereafter had an on-and-off-again relationship up until Brown's death on December 25, 2006.

In 2007, five of the six adult children Brown named in his will as well as Tommie Rae, all Respondents herein, brought actions to set aside Brown's will and the 2000 Irrevocable Trust based on undue influence. They alleged Brown's estate should, instead, pass by the laws of intestate succession. Tommie Rae claimed that she was entitled to an elective share or an omitted spouse's share of Brown's estate and that her son, James B. (via a guardian ad litem), was entitled to a share of the estate as an omitted child. The probate court transferred these claims and all filings thereafter to the circuit court.

· Appellants were initially appointed by the circuit court in March 2007 as Special Administrators with limited duties to oversee the handling of Brown's estate after petitions were filed by some of Brown's family members seeking the removal of Dallas, Bradley, and Cannon as personal representatives. The court made the selection after the parties could not agree on who should be appointed. Ultimately, the three original fiduciaries either resigned or were removed from their positions as personal representatives and trustees.[2]

In November 2007, the circuit court appointed Appellants as the personal representatives for Brown's estate and as trustees of the 2000 Irrevocable Trust, with full authority as if they had been appointed in the original placement order. The South Carolina Attorney General ("AG"), who had recently intervened in the case on the ground the claims involved a charitable trust, unsuccessfully opposed the appointment of Appellants as fiduciaries.[3]

---

**2.** The three left amid allegations that Cannon had misappropriated funds belonging to Brown. Bradley is now deceased. In 2011, Cannon entered a plea under *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) to charges of taking money from Brown, for which he was sentenced to house arrest. The prosecuting authority did not seek restitution from Cannon although Cannon reportedly retained a million-dollar mansion in Honduras as well as an interest in Brown's publishing companies.

**3.** Although references herein are to the "AG" generally, the current AG's predecessor handled most of the filings in this matter, including

After ongoing negotiations directed by the AG, the parties entered into a compromise agreement at an informal mediation session on August 10, 2008. The settling parties named in the agreement were Tommie Rae, the children and grandchildren of Brown, and the AG. Appellants contend they did not participate in the discussions or in the agreement as they received no notice of them. The agreement was thereafter submitted to the circuit court for its approval pursuant to S.C.Code Ann. § 62-3-1102 (2009). Appellants were given notice of the agreement and participated in all proceedings related to the court's consideration of the compromise.

In January 2009, the circuit court appointed Russell L. Bauknight, a certified public accountant, as Special Administrator for Brown's estate and Special Trustee of the 2000 Irrevocable Trust. Bauknight was appointed, at the Respondents' suggestion, for the limited purpose of providing input and recommendations to the court regarding the compromise agreement. The circuit court ordered Appellants to continue in their fiduciary capacities at that time, except for the limited duties assigned to Bauknight.

A hearing was conducted over seven days from January to April 2009. At the first hearing date on January 30th, the parties advised the circuit court that Respondent Terry Brown, one of the six children Brown named in his will, had joined in the compromise, so that the agreement now included an addendum. In exchange for his participation, Terry Brown was given "an absolute and superior Right of First Refusal to purchase any and all of the James Brown Assets (whether on an asset or stock basis) to be sold in any Proposed Transfer" for a period of ten years.

The circuit court approved the compromise agreement by order of May 26, 2009, over the objections of Appellants.[4] The

the motion to intervene, which the circuit court granted, without objection, on October 11, 2007. The court also granted the Georgia AG's motion to intervene, but the Georgia AG is no longer participating in the action, as it was later determined South Carolina's AG was the appropriate and necessary party.

4. The compromise agreement contained in the record is actually a series of documents signed by some of the parties at different times, rather than one agreement, and an addendum signed by all parties.

circuit court found the agreement was executed by all persons having beneficial interests that were affected by the compromise, the will and trust controversy was pursued in good faith, and the agreement was fair, equitable, and reasonable.

Under the terms of the agreement brokered by the AG, the parties would jointly seek the removal of Appellants as the personal representatives of Brown's estate and as trustees of the 2000 Irrevocable Trust. All challenges to the will were to be dismissed, and the settling parties agreed that such contests were brought in good faith and with probable cause. Tommie Rae was recognized as the surviving spouse of Brown, and all children and grandchildren who were parties to the agreement were acknowledged to be Brown's legitimate issue and heirs without the need for DNA testing to verify their status.

The settling parties agreed to create a new trust called the James Brown Legacy Trust ("Settlement Entity"), which will "receive, hold, manage and be authorized to sell the James Brown Assets." The trustee and any successor trustee for the Settlement Entity was to be selected solely by the AG. The settling parties who had any intellectual property rights to Brown's music or persona created under federal copyright laws or laws for heirs agreed to surrender those rights to the Settlement Entity. Tommie Rae waived any spousal rights that she might have and the children waived any rights to Brown's assets that they might otherwise have beyond any share to be received in the compromise.

A (New) Charitable Trust, similar to the existing Charitable Trust formed from the 2000 Irrevocable Trust, was to be created by the AG with the advice and counsel of the parties. The AG was to have the sole authority to select the managing trustee as well as any successor trustee. An Advisory Board was to be established, whose members would "serve at the pleasure of and on such terms as the [AG] shall decide." The number of members on the Advisory Board was to be determined by the AG, but would include a member selected by Tommie Rae and one selected by each of Brown's adult children, and the roles of all members of the board were expressly stated to "be solely advisory." The (New) Charitable Trust would also have Honorary Family Trustees in a

number to be decided by the AG and who would serve under the same terms and conditions as the Advisory Board. A trust similar to the Brown Family Education Trust was to be established for the education of the grandchildren and their issue, to be funded with $2 million.

The parties were to divide their distributional interest in the Settlement Entity as follows: a net 47.5% to the (New) Charitable Trust; a net 23.75% to Tommie Rae, which includes any share attributable to her son; and a net 4.79% to each of Brown's adult children who are settling parties. For voting purposes, however, the (New) Charitable Trust was to retain a 50% voting and control interest in the Settlement Entity, the named adult children were to retain a 25% voting and control interest, and Tommie Rae was to retain a 25% voting and control interest. The parties indicated in their agreement that they intended this to be a binding private agreement, but they also desired court approval of the agreement.

The circuit court approved the compromise agreement and directed Appellants to execute the agreement. At the request of the settling parties, the circuit court appointed Bauknight to have full authority as the personal representative for Brown's estate and as trustee, and Appellants were removed from those positions.

Appellants appealed these rulings as well as additional, related orders, and the Court of Appeals consolidated the appeals. This Court granted a request for certification by the Court of Appeals pursuant to Rule 204(b), SCACR, and the case was transferred to the Supreme Court.

## II. LAW/ANALYSIS

### A. Standing

■ As an initial matter, Respondents assert Appellants do not have standing to pursue this appeal because they have no interest in the subject matter of the litigation, i.e., the will and trust; therefore, the appeal should be dismissed. Specifically, Respondents argue Appellants lack standing to appeal the circuit court's approval of the settlement agreement and the AG's involvement since they had no vote or veto power over

the settlement at the trial level. Respondents further argue Appellants lack standing to appeal their removal as personal representatives and trustees because (1) their failure to adequately brief this point operates as a waiver of the issue; and (2) once the order was issued removing them as fiduciaries, its effect was immediate and their only interest in this matter became a peripheral one pertaining to their claim for fees for the time they acted as fiduciaries.

"Before any action can be maintained, there must exist a justiciable controversy." *Byrd v. Irmo High Sch.*, 321 S.C. 426, 430, 468 S.E.2d 861, 864 (1996). Justiciability encompasses several doctrines, including ripeness, mootness, and standing. *Jackson v. State*, 331 S.C. 486, 491 n. 2, 489 S.E.2d 915, 917 n. 2 (1997) (citation omitted). "Standing refers to a party's right to make a legal claim or seek judicial enforcement of a duty or right." *Michael P. v. Greenville County Dep't of Soc. Servs.*, 385 S.C. 407, 415, 684 S.E.2d 211, 215 (Ct.App.2009). "Generally, to have standing, a litigant must have a personal stake in the subject matter of the litigation." *Id.* at 415–16, 684 S.E.2d at 215.

As noted by Appellants, there was no specific ruling discussing Appellants' standing in the circuit court's order of May 2009, and the matter was not raised in a Rule 59 motion. Although the circuit court did refer to standing, it was in the context of discussing authority from another jurisdiction when the circuit court reviewed the facts of that case. This Court has previously declined to consider standing where the matter was not both raised to and ruled upon by the trial court, and it is questionable whether the issue was properly preserved here, although it was briefed. *See, e.g., James v. Anne's Inc.*, 390 S.C. 188, 193, 701 S.E.2d 730, 732–33 (2010) (observing this Court has the inherent authority to consider justiciability, but when a party raises the issue, our courts have applied error preservation principles and have held the issue was not preserved where the trial court did not first rule on the issue).

Assuming, *arguendo,* that the circuit court impliedly ruled on the issue, we conclude Appellants have standing. Appellants were properly made parties to the action and were allowed to set forth specific challenges to the proposed compromise agreement for the circuit court's consideration under

S.C.Code Ann. § 62–3–1102 (2009). We agree with Appellants that they have standing based on the explicit terms of the trust agreement, which conferred upon the trustees the authority to handle claims for or against the trust estate (including the authority to mediate or compromise claims), and based on their official fiduciary capacities pursuant to state law.[5] *See* S.C.Code Ann. § 62–7–405(c) (2009) ("The settlor of a charitable trust, the trustee, and the Attorney General, among others may maintain a proceeding to enforce the trust."); P.H. Vartanian, Annotation, *Right of Trustee of Express Trust to Appeal from Order or Decree Not Affecting His Own Personal Interest,* 6 A.L.R.2d 147, 152 (1949 & Later Case Service 1997) (stating where an order threatens the existence of a trust, prevents a trustee from performing his duties, or depletes the trust fund with unreasonable claims, the trustee may, in his fiduciary or representative capacity, appeal therefrom as an aggrieved party); *see also Columbia Union Nat'l Bank & Trust Co. v. Bundschu,* 641 S.W.2d 864, 879 n. 10 (Mo.Ct.App. 1982) (stating "where a trustee is affected by a judgment in his official capacity, he is aggrieved and may appeal"); *In Re Estate of Birch,* 50 A.D.2d 475, 378 N.Y.S.2d 792, 797 (1976) (holding "that the Attorney General and the trustee had standing" because "[t]he trustee has a legal obligation to defend the trust ... [and] [t]he Attorney General, likewise, has a duty to represent the beneficiaries where there are dispositions for religious and charitable purposes"); *In re Crawford's Estate,* 340 Pa. 187, 16 A.2d 521 (1940) (involving an appeal from an order removing the appellant as a co-trustee).

## B. Court's Approval of Compromise Agreement

In their appeal, Appellants contend the compromise agreement was not eligible for court consideration under section 62–3–1102 because the trust did not agree to it and the AG had no authority to speak for the trust. Appellants assert a compromise can be considered under the statute only if all holders of beneficial interests agree to it, and the 2000 Irrevocable Trust, which was entitled to the residue of Brown's estate, was the

---

5. We need not reach Appellants' alternative arguments that they have constitutional standing or standing under the public importance exception.

chief holder of a beneficial interest in the estate. The trust, however, was not represented in the settlement and did not agree to reducing its share of Brown's estate by half, so there was no compromise agreement for the circuit court to consider.

Appellants argue the AG's authority to enforce a charitable trust does not give him the authority to direct the settlement of an estate dispute, remove existing trustees, and administer a new trust with the AG at the helm. Appellants argue the AG effectively placed himself in control of most of Brown's assets by securing sole authority to select a managing trustee of the new entity, and then proceeded to give away over half of the estate to disinherited family members and purported family members, all in contravention of Brown's express wishes that the bulk of his wealth be used for the charitable purpose of educating disadvantaged youths.

Appellants further assert that, even if the agreement were eligible for court consideration, the agreement did not meet the statutory standard necessary to nullify Brown's estate plan because (1) it was not a compromise of a bona fide (good faith) challenge to Brown's will, and (2) it was unjust and unreasonable.

██ Upon appeal, "[t]he question [for an appellate court] is did the [ruling] court abuse its discretion in approving the compromise?" *In re Estate of Horton,* 11 Cal.App.3d 680, 90 Cal.Rptr. 66, 68–69 (1970). An abuse of discretion occurs when a court's order is controlled by an error of law or there is no evidentiary support for the court's factual conclusions. *Fairchild v. S.C. Dep't of Transp.,* 398 S.C. 90, 727 S.E.2d 407 (2012); *see also Univ. of S. Cal. v. Moran,* 365 S.C. 270, 617 S.E.2d 135 (Ct.App.2005) (stating the interpretation of a statute approving a compromise agreement presents a question of law); *Perreault v. The Free Lance–Star,* 276 Va. 375, 666 S.E.2d 352 (2008) (same). For the reasons to be discussed, we hold the circuit court erred in approving the compromise agreement in the current matter.

### (1) Eligibility for Court Consideration

██ We first consider Appellants' contention that the proposed compromise agreement was ineligible for court consideration.

■■■

■ "A compromise agreement is void unless executed in compliance with the governing statute." *In re Estate of Riley,* 228 Ariz. 382, 266 P.3d 1078, 1080 (Ct.App.2011). Section 62–3–1102 of the South Carolina Code establishes the following procedure for securing court approval of a compromise agreement resolving an estate controversy:

(1) The terms of the compromise shall be set forth in an agreement in writing which *shall be executed by all competent persons* and parents acting for any minor child *having beneficial interests or having claims which will or may be affected by the compromise. . . .*

(2) *Any interested person,* including the personal representative or a trustee, then may submit the agreement to the court for its approval *and for execution by the personal representative, the trustee of every affected testamentary trust, and other fiduciaries and representatives.*

(3) *After notice to all interested persons or their representatives,* including the personal representative of the estate and all affected trustees of trusts, *the court,* if it finds that the contest or controversy is *in good faith* and that the effect of the agreement upon the interests of persons represented by fiduciaries or other representatives is *just and reasonable, shall make an order approving the agreement and directing all fiduciaries subject to its jurisdiction to execute the agreement.*

S.C.Code Ann. § 62–3–1102 (2009) (emphasis added).[6] "Upon the making of the order and the execution of the agreement, all further disposition of the estate is in accordance with the terms of the agreement." *Id.* § 62–3–1102(3).[7]

---

**6.** The first sentence of subsection (3) was amended in 2010, but the change does not impact this appeal. Act No. 244, 2010 S.C. Acts 1764.

**7.** *See Columbia Union Nat'l Bank & Trust Co.,* 641 S.W.2d at 874 (stating once a compromise agreement is approved, the property devolves under the terms of the agreement, not the testamentary instrument, so the judgment on appeal adjudicates a contract, not a will contest, and the efficacy of the agreement depends only on the written agreement among all persons with a beneficial interest or claim affected by the compromise and the determination of the ruling court that the controversy is in good faith and that the agreement affects fairly the interests of persons represented by fiduciaries or their representatives).

Citing *University of Southern California v. Moran,* 365 S.C. 270, 617 S.E.2d 135 (Ct.App.2005), Appellants contend "where a trust is beneficiary of a devise, it is the trust, acting through its trustee, which alone has statutory authority to participate in a Section 1102 settlement agreement." [8] Appellants contend the circuit court could not approve the compromise agreement without their consent as trustees. Appellants assert they were not given notice of the parties' negotiations, so the beneficiaries were unrepresented. They also contend the circuit court erred in finding the AG has the authority to direct or enter into a compromise on behalf of the charitable beneficiaries.

Respondents, in contrast, contend Appellants are improperly attempting to broaden *Moran* to give a trustee absolute and sole control over settlements, and this is antithetical to the purpose of section 62–3–1102. They state that under Appellants' theory, the beneficiaries of a trust could *never* reach a compromise because a trustee could always single-handedly veto the process.

Respondents argue that under the statutory framework, the important question is whether all beneficial interests were represented *at the hearing* in this matter. The AG asserts he represents the beneficial interests of a charitable trust, but even if he does not, the charitable beneficiaries would have been represented by Appellants at the hearing, since they contended they represented the "trust" and were present to voice their objections to the proposed compromise. Consequently, the charitable beneficiaries were represented at the hearing, either by the AG or by Appellants as trustees.

---

8. In *Moran,* the Court of Appeals held that a trust, created by a pour-over provision in the decedent's will, was the entity with a "beneficial interest" in the decedent's *estate,* whereas the appellant University, which was a beneficiary of the *trust,* was merely an "interested person" in the estate. 365 S.C. at 282–83, 617 S.E.2d at 141–42. Therefore, the trustee had the authority to compromise a claim on behalf of the trust and the trustee was required to execute a compromise agreement to settle a dispute over the estate. *Id.* The court held the University was entitled to notice and to an opportunity to voice its objection to the compromise, but its signature was not required for court approval of the agreement. *Id.* The *Moran* case did not involve the AG's representation of charitable beneficiaries, however, so there is no discussion in this regard.

Moreover, trustees do not have a statutory right to unilaterally prevent a compromise.

Under the statute, any "interested person"[9] may submit the proposed agreement to the court after notice has been given to all interested persons and their representatives, and the agreement must be executed by all persons having "beneficial interests" in the estate[10] as well as fiduciaries. Thus, Appellants unquestionably were entitled to notice (and a corresponding opportunity to be heard) and they were necessary signatories based on the express terms of the statute. Appellants dispute, however, whether they were properly noticed and whether their signatures could be compelled by the court, and they contend the agreement was not eligible for the court's consideration.

Although Appellants were not given notice of the *negotiations* engaged in by the other parties *prior* to reaching the settlement, Appellants admittedly were given notice of the proposed compromise ultimately reached, and they fully participated in the extensive hearings held over a four-month period in the circuit court, at which time they were given the opportunity to voice their objections. It is notice of the proposed compromise and any hearings that is statutorily

9. An "interested person" under our Probate Code "includes heirs, devisees, children, spouses, creditors, beneficiaries, and any others having a property right in or claim against a trust estate or the estate of a decedent, ward, or protected person which may be affected by the proceeding. It also includes persons having priority for appointment as personal representative and other fiduciaries representing interested persons." S.C.Code Ann. § 62–1–201(20) (2009).

10. The Reporter's Comments to section 62–3–1102 state, "The agreement must be signed by all persons having a beneficial interest in or claim against *the estate*, whose interest or claim is affected by the agreement." Reporter's Comments to S.C.Code Ann. § 62–3–1102 (2009) (emphasis added). What constitutes a "beneficial interest in an estate" is not specifically defined in the Probate Code. *See Milner v. Milner*, 361 S.W.3d 615, 620 (Tex.2012) (defining a "beneficial interest" as "[a] right or expectancy in something (such as a trust or an estate), as opposed to legal title to that thing" (alteration in original)) (quoting *Black's Law Dictionary* 885 (9th ed.2009)); *accord In re Estate of Sullivan*, 724 N.W.2d 532 (Minn.Ct.App.2006) (also applying the definition in *Black's Law Dictionary*). The Probate Code does define a "beneficiary" in S.C.Code Ann. § 62–1–201(2), but only as it relates to trusts.

required, as it is the final proposal that is subject to the court's scrutiny under section 62–3–1102. The method by which the proposal was reached, including how many of the parties actively participated in any preliminary discussions, is not a determinative factor in whether the agreement is *eligible* to be presented to the circuit court for consideration.[11]

In addition, section 62–3–1102(3) specifically states that if the court "finds that the contest or controversy is in good faith and that the effect of the agreement upon the interests of persons represented by fiduciaries or other representatives is just and reasonable, [it] *shall make an order approving the agreement and directing all fiduciaries subject to its jurisdiction to execute the agreement.*" S.C.Code Ann. § 62–3–1102(3). Thus, while Appellants were necessary signatories to the compromise, it is clear from the plain language of the statute that the circuit court had the authority to direct their execution of the document if it found the two preceding conditions for approval were met.

The Reporter's Comments to section 62–3–1102 reiterate that a personal representative or testamentary trustee may be *directed* by the court to sign the agreement:

> Subsection (2) requires submission of the agreement to the probate court for approval. The application for approval may be made by an interested party or by the personal representative. The application would request approval of the agreement and would request an order *directing or permitting* the personal representative and the trustee of an affected testamentary trust to execute the agreement.

Reporter's Comments to S.C.Code Ann. § 62–3–1102 (2009) (emphasis added).

The official Comment to section 3–1102 of the Uniform Probate Code, on which our South Carolina statute is based, states the provision for obtaining court approval of compromise agreements was specifically intended to *prevent* executors and testamentary trustees from single-handedly vetoing such agreements:

---

11. Any alleged overreaching by the AG in the actual terms of the settlement and any resulting unfairness in the compromise ultimately reached are more appropriately considered in evaluating if the compromise was just and reasonable.

> The thrust of the procedure [for approving settlement agreements] is to put the authority for initiating settlement proposals with the persons who have beneficial interests in the estate, *and to prevent executors and testamentary trustees from vetoing any such proposal.... * Because executors and trustees may have an interest in fees and commissions which they might earn through efforts to carry out the testator's intention, *the judgment of the court is substituted for that of such fiduciaries* in appropriate cases.[12]

Unif. Probate Code, Comment to § 3–1102 (amended 1993), 8 U.L.A. 305 (1998) (emphasis added).

As the Comment to section 3–1102 of the Uniform Act unequivocally states, the purpose of this provision is to prevent trustees from unilaterally vetoing settlement agreements based on a desire to earn fees or based on some other motive. *See In re Estate of Riley,* 228 Ariz. 382, 266 P.3d 1078, 1083 (Ct.App.2011) (observing the purpose of the statute regarding compromise agreements, which is based on the Uniform Probate Code, is to keep the power to make compromises involving the estate in the hands of the estate's beneficiaries and to prevent executors and testamentary trustees from vetoing such proposals); *In re Estate of Smith,* 44 A.D.2d 851, 355 N.Y.S.2d 994, 995 (1974) (stating "Appellant, as executor and trustee under the will, does not have such an interest as would prevent any compromise made among all the parties beneficially interested in the estate"; "the interests sought to be protected under a compromise agreement are those of named and unnamed beneficiaries"); *In re Estate of Smith,* 75 Misc.2d 895, 349 N.Y.S.2d 281 (1973) (holding the objections of the preliminary executor and nominated executor and trustee to the proposed settlement should be overruled and that the attorney general has the right and power to enter into a compromise on behalf of the ultimate, unspecified, and indefinite charitable beneficiaries mentioned in the decedent's will); *see also In re Will of Seabrook,* 90 N.J.Super. 553, 218 A.2d 648, 652 (1966) (holding the beneficiaries of a will could compromise a challenge to a will without the consent of the executors and trustee named in the will and codicil and noting

---

12. The AG argues Appellants have sought $5 million in fees for their service, so this case would be an appropriate one for the court to substitute its judgment for that of the fiduciaries.

the interests of the charitable beneficiaries were represented by the attorney general; the court stated, " 'In a proper case the court has power to compel a trustee to execute a compromise agreement.' " (citation omitted)); Mary F. Radford, George Gleason Bogert, & George Taylor Bogert, *The Law of Trusts & Trustees* § 1009, at 450 n. 3 (3d ed. 2006) ("Under UPC §§ 3–1101 and 3–1102 a compromise of a will contest will bind a testamentary trustee.").

 In general, we agree with Appellants that, as the trustees of the 2000 Irrevocable Trust, they were conferred the authority under the trust documents and under South Carolina law to compromise claims involving the trust. However, where the trust involves charitable entities, the trustee has a duty to defend the trust, and the AG has the duty to represent the unspecified charitable beneficiaries. *See In Re Estate of Birch*, 50 A.D.2d 475, 378 N.Y.S.2d 792, 797 (1976) (stating "[t]he trustee has a legal obligation to defend the trust . . . [and] [t]he Attorney General, likewise, has a duty to represent the beneficiaries where there are dispositions for religious and charitable purposes"); *see also* S.C.Code Ann. § 1–7–130 (2005) (providing the AG shall enforce the due application of funds given or appropriated to public charities within the state); S.C.Code Ann. § 62–7–405(c) (2009) ("The settlor of a charitable trust, the trustee, and the Attorney General, among others may maintain a proceeding to enforce the trust."); *Epworth Children's Home v. Beasley*, 365 S.C. 157, 616 S.E.2d 710 (2005) (stating the AG is the proper party to protect the interests of the public at large in administering or enforcing charitable trusts). The AG was allowed to intervene in this action, without objection, and there is no challenge on appeal as to the propriety of the intervention.[13]

Contrary to Appellants' assertion, it was the circuit court, not the AG, which gave final approval to the compromise agreement submitted by the parties, and the circuit court repeatedly noted its duty was to review the compromise to determine if it satisfied the two statutory factors (a good faith

---

**13.** The order authorized the AG "to intervene in this matter to represent and protect the interests of the beneficiaries of any charitable trust created by [Brown's 2000 will] and the [2000 Irrevocable Trust] or any other assets of the Estate of James Brown that may be impressed with a charitable trust. . . ."

controversy, a fair and just effect), and it set forth its findings in this regard. In contrast, the requirements to seek court approval of an agreement under section 62–3–1102 are distinguishable, i.e., the agreement must be in writing and executed by all parties with beneficial interests in the estate, it must be submitted to the court by an interested party, notice must be given to all interested parties, and there must be an opportunity to be heard. We find these requirements were met and the compromise was eligible for the court's consideration.

### (2) Section 62–3–1102's Two–Part Test for Court Approval

Having found the circuit court may approve a compromise agreement after notice to, but over the objection of, Appellants, our next consideration is the propriety of the circuit court's approval of the agreement itself. In this regard, a two-part test is employed under section 62–3–1102: (1) whether the compromise settles a good-faith controversy between the parties, and (2) whether the compromise is just and reasonable.

In this case, actions were brought by some of Brown's adult children and Tommie Rae to set aside Brown's will and the 2000 Irrevocable Trust on the ground of undue influence. Tommie Rae also claimed she was entitled to an elective share or an omitted spouse's share of Brown's estate as his surviving legal spouse, and that her child, James B., was entitled to a share of the estate as an omitted child. In approving the compromise, the circuit court found the settling parties had initiated their contests to Brown's will and trust in good faith, and that the settlement was just and reasonable. We question whether the parties established the existence of a good faith controversy, but conclude the compromise was not just and reasonable, in any event.

### (a) Requirement of a Good Faith Controversy

The first part of the two-part statutory mandate of section 62–3–1101(3) requires that the court "finds that the contest or controversy is in good faith[.]"

The circuit court found that there was a good faith basis for each of the claims asserted by Respondents. As to the claim of undue influence, the circuit court found the credibility of the

four principal witnesses to the validity of the will and the 2000 Irrevocable Trust was questionable because the attorney who drafted the will, H. Dewain Herring, is now in jail for a crime of violence, and the testimony of the three original trustees, Dallas, Bradley, and Cannon, who had been removed from their fiduciary positions, was suspect and contradictory in prior proceedings. For example, the court noted Dallas had testified that he had knowingly allowed his attorney to agree to a stipulation containing false information because he did not want to lose his position as a fiduciary. The court found the questionable credibility of these four individuals supported the good faith basis of the contestants' claims. Further, the circuit court found there were several examples of undue influence in the record, including the fact that the trust authorized the trustees to spend up to 50% of gross income for management purposes, and there was a blank deed signed by James Brown and witnessed in Herring's client file. The court also noted there was a controversy regarding what assets were actually transferred to the trust during Brown's lifetime.

The circuit court further found a good faith controversy existed regarding the assertion of Tommie Rae for either an elective share [14] or an omitted spouse's share [15] of the estate. The court stated that, although Tommie Rae had undergone a

14. A "surviving spouse has a right of election to take an elective share of one-third of the decedent's probate estate." S.C.Code Ann. 62-2-201(a) (2009). "[P]robate estate means the decedent's property passing under the decedent's will plus the decedent's property passing by intestacy, reduced by funeral and administration expenses and enforceable claims." *Id.* § 62-2-202. The right of election of a surviving spouse and the rights of the surviving spouse to a homestead allowance and exempt property can be waived by a written agreement. *Id.* § 62-2-204.

15. The omitted spouse statute provides that, "[i]f a testator fails to provide by will for his surviving spouse who married the testator after the execution of the will, the omitted spouse, upon compliance with the provisions of subsection (c), shall receive the same share of the estate [s]he would have received if the decedent left no will unless: (1) it appears from the will that the omission was intentional; or (2) the testator provided for the spouse by transfer outside the will and the intent that the transfer be in lieu of a testamentary provision is shown by statements of the testator or from the amount of the transfer or other evidence." *Id.* § 62-2-301(a).

purported marriage ceremony in 1997 with another man before she had a marriage ceremony with Brown in 2001, Tommie Rae had obtained an annulment of her marriage to Ahmed on April 15, 2004 on the basis Ahmed did not have the capacity to marry. Thus, there was no impediment to her marriage to Brown.[16] The circuit court also found that an agreement that Tommie Rae had executed in which she agreed never to assert a common law marriage with Brown had no bearing on Tommie Rae's claim as a surviving legal spouse. Moreover, after that agreement was executed, Brown published an autobiography in which he referred to Tommie Rae as his "wife" and to James B. as his "son," so the circuit court found Tommie Rae's legal status was muddled by the actions of the parties.

Even if Tommie Rae did not prevail on a claim for a spousal share, the circuit court found significant arguments existed to warrant recognizing a claim for an omitted child's share for James B. under S.C.Code Ann. § 62–2–302 (2009), which would allow the child an intestate share of the probate estate. The court did note that such a claim is not conclusive, however, because if Brown had made transfers to the child that were in lieu of a provision by will, then those transfers could be deemed to satisfy the child's share.[17] The circuit court stated it was not only the presence of each of these individual,

16. Tommie Rae had claimed her marriage to Ahmed had been procured by fraud because she had discovered that Ahmed already had three or more wives in Pakistan and was merely seeking U.S. citizenship, and that he had refused to live with her as husband and wife. Tommie Rae's request for an annulment from Ahmed was hastily granted by the family court in Charleston County during the pendency of Brown's separate annulment action against her. The circuit court noted the decision of the Court of Appeals in *Lukich v. Lukich*, 368 S.C. 47, 627 S.E.2d 754 (Ct.App.2006), in which the Court of Appeals held that an annulment declaring a spouse's first marriage void could not retroactively validate the spouse's second marriage. The circuit court distinguished Brown's situation, opining that the rule in *Lukich* did not apply where the first marriage was never valid because one of the parties was already married. This Court has since affirmed *Lukich*, in *Lukich v. Lukich*, 379 S.C. 589, 666 S.E.2d 906 (2008). We express no opinion, however, on the circuit court's interpretation here.

17. The statute provides, "If a testator fails to provide in his will for any of his children born or adopted after the execution of his will, the omitted child, upon compliance with subsection (d), receives a share in

primary claims, but also their cumulative effect, that supported its finding of a good faith controversy between the parties.

In general, a threat to contest a will must be made in good faith in order for the surrender of the right to constitute consideration for a family settlement, and if it is made in bad faith to extort a settlement, or if the claim is known to be frivolous and without foundation, then it is not in good faith. M.L. Cross, Annotation, *Family Settlement of Testator's Estate*, 29 A.L.R.3d 8, at § 27 (1970 & Supp.2011).

The "good faith" requirement has been variously interpreted, with jurisdictions applying definitions that can be categorized along a continuum from a subjective to an objective standard,[18] and they have afforded the claims a level of scrutiny that is less than that given to ordinary contracts, up to what has been described as "close scrutiny." [19]

---

the estate equal in value to that which he would have received if the testator had died intestate unless: (1) it appears from the will that the omission was intentional; or (2) when the will was executed the testator had one or more children and devised substantially all of his estate to his spouse; or (3) the testator provided for the child by transfer outside the will and the intent that the transfer be in lieu of a testamentary provision is shown...." S.C.Code Ann. § 62–2–302(a) (2009).

18. *Compare* 80 Am.Jur.2d *Wills* § 982 (2002) (stating "it need not appear that a ground of opposition in fact would have defeated the will; rather, it is enough if the parties consider it so far doubtful as to be the subject of a compromise" (footnote omitted)), *with Holt v. Holt*, 304 N.C. 137, 282 S.E.2d 784, 787 (1981) ("The mere relinquishment of a right to contest a will is not sufficient consideration to support a reciprocal promise to modify the will unless there is a *bona fide* dispute as to the will's validity."), *and id.* at 789 ("Whether there is a *bona fide* dispute depends, furthermore, not on what any particular party to the alleged compromise may subjectively believe about it, but whether the *bona fides* of the disagreement may, under all the facts and circumstances of the case, be reasonably found to exist by the trier of fact. This principle inheres in our decisions; and cases from other jurisdictions with near uniformity hold that absent any basis in fact and law upon which to challenge the validity of a will, a compromise promise to distribute the property differently from the manner contemplated by the will is unenforceable due to lack of consideration if the reciprocal promise is merely not to contest the will.").

19. *Compare Skaggs v. Cullipher*, 57 Ark. App. 50, 941 S.W.2d 443, 447 (1997) (stating family agreements resolving estate and will matters "are

■■■■■■

■ However, it is universally acknowledged that full proof of the asserted claims is not required because the *raison d'etre* for the statute is to dispense with the necessity of litigating the merits of the claims. The circuit court's duty was not to decide the ultimate question of the merits of the undue influence and other claims; rather, the statutory standard is whether the proposed compromise agreement resolves a good faith controversy and whether the agreement is just and reasonable. *See generally* M.L. Cross, *supra*, 29 A.L.R.3d 8 (family settlements); *see also Warner v. Warner*, 124 Conn. 625, 1 A.2d 911, 914–15 (1938) (stating forbearance in pursuing a claim known to be frivolous or without foundation is not in good faith; however, the question is not whether there was in fact undue influence, but whether the parties could in good faith reasonably believe so, and the test is not whether the claim would have succeeded in the litigation, as that would involve a trial of the issue that was compromised, and the purpose of the law in encouraging compromises would thus be defeated; a compromise does not import finality as to the sufficiency of the grounds for opposition to a will, as the compromise in effect includes a discontinuance of the investigation of the claim); *In re Estate of Yeley*, 959 N.E.2d 888, 893 (Ind.Ct.App.2011) ("A court order approving a settlement agreement is not an adjudication of the issues of the litigation, but rather is an avoidance of adjudication.").

That being said, we have substantial concerns about the circuit court's findings in this regard. Although proof of a claim is not required, we believe something more than a subjective belief or a mere allegation is necessary to avoid the potential for collusion among disinherited or disgruntled family members who wish to dispose of the testator's estate plan and substitute it with one more to their liking.

---

afforded a legal status distinct from typical contracts, and will be enforced without closely scrutinizing the consideration of the transaction or the strict legal rights of the parties"), *with Fleisch v. First Am. Bank*, 305 Ill.App.3d 105, 238 Ill.Dec. 179, 710 N.E.2d 1281, 1283–84 (1999) (stating "family settlements are subjected to close scrutiny to determine whether the disputes they purport to resolve are genuine or simply ill-conceived threats concocted to subvert the settlor's intent" (citation omitted)).

 As to the claim of undue influence, it has been frequently stated that, "[i]n order to void a will on the ground of undue influence, the undue influence must destroy free agency and prevent the maker's exercise of judgment and free choice." *In re Estate of Cumbee,* 333 S.C. 664, 671, 511 S.E.2d 390, 393 (Ct.App.1999). The influence necessary to void a will must amount to force and coercion. *Id.* "A mere showing of opportunity or motive does not create an issue of fact regarding undue influence." *Id.* "In cases where allegations of undue influence have been successful, there has been evidence of threats, force, restricted visitation, or an existing fiduciary relationship at the time of or before the will's execution." *Id.* at 671–72, 511 S.E.2d at 394 (citation omitted). Although there is a presumption of undue influence in the making of a will involving fiduciaries, the ultimate burden always remains with the proponent. *Gordon v. Busbee,* 397 S.C. 119, 723 S.E.2d 822 (Ct.App.2012). "[T]he circumstances must point unmistakenly and convincingly to the fact that the mind of the testator was subject to that of some other person so the will is that of the latter and not of the former." *Byrd v. Byrd,* 279 S.C. 425, 427, 308 S.E.2d 788, 789 (1983). In addition, "even if a contestant does establish an inference of undue influence, the unhampered opportunity of the testator to change the will after the operation of undue influence destroys this conclusion." *Hembree v. Estate of Hembree,* 311 S.C. 192, 196–97, 428 S.E.2d 3, 5 (Ct.App.1993).

The circuit court's scant references to alleged improprieties in the handling of Brown's will, while troubling, do not bear directly on the issue of whether Brown's desires for the disposition of his estate were overborne to such an extent that the resulting distribution was not the product of his own free will. In particular, although the circuit court focused on the later imprisonment of the attorney who drafted the will, the imprisonment was for a crime totally unrelated to his services as an estate planner. This fact has no bearing on the execution of Brown's testamentary documents and sheds no light on whether Brown's will was somehow overcome at the time he signed the documents finalizing his estate plan. *See Russell v. Wachovia Bank,* 353 S.C. 208, 219, 578 S.E.2d 329, 335 (2003) ("In order for the will to be void due to undue influence, '[a] contestant must show that the influence was brought directly

to bear *upon the testamentary act.*' ") (alteration in original) (emphasis added) (quoting *Mock v. Dowling,* 266 S.C. 274, 277, 222 S.E.2d 773, 774 (1976)).

Similarly, the fact that one provision regarding management fees in the trust could be deemed "generous" would support at most reformation of the document, but would not justify the complete destruction of Brown's estate plan.[20] *See generally In re Estate of Schroeder,* 441 N.W.2d 527 (Minn.Ct.App.1989) (stating to constitute a good faith will contest, the objections must have legal merit; the appellate court found that even if the testimony were true, at most it would have supported reformation of the will, not the overthrow of the decedent's entire testamentary plan); *Dixon v. Dixon,* 362 S.C. 388, 399, 608 S.E.2d 849, 854 (2005) (stating "a showing of general influence is not tantamount to undue influence" and "a contestant must show that the undue influence was brought directly to bear upon the" challenged transaction such that it prevented the grantor's exercise of judgment and free choice).

All indications in the record are that Brown was of sound mind and strong physical constitution until the time of his death, as he had only recently returned from touring and was making preparations for future performances when he suddenly became ill and passed away. *Cf. Russell,* 353 S.C. at 219, 578 S.E.2d at 335 (finding no undue influence where it was "undisputed that [the] [t]estator was independent, and physically mobile until a few days before his death," and that the "[t]estator, while elderly, was not infirm, mentally or physically, and was not prevented from seeing relatives, friends or business associates").

It appears Brown painstakingly developed his estate plan over the course of several years, and in various drafts, including the will in dispute here, Brown made it clear that he intended the bulk of his estate to be used for the education of disadvantaged youths, as he had provided for his family members during his lifetime. His estate documents explicitly state that he had named all of those he wished to be the

---

20. Both Brown's will and trust contained severability clauses that stated if any part thereof should be found invalid, illegal, or inoperative for any reason, it was his intention that the remaining parts be fully effective as far as possible and reasonable.

beneficiaries of his estate, and that any further claimants, including future spouses or those purporting to be heirs, were purposefully excluded. Another strong indicator of Brown's intent is his inclusion of no-contest clauses in both his will and trust.

The record contains numerous references to the fact that Brown repeatedly made his intentions known during his lifetime to his family, friends, and business associates, and he had even met with family members not too long before his unexpected death and had reaffirmed his intentions in this regard. Brown had a reputation as a strong-willed individual who did not take orders from others, and he made his desires abundantly clear during his lifetime. We find there is no reasonable basis for the undue influence claim asserted here other than as a means to dismantle Brown's estate plan. The result is to enable those who were disinherited to obtain Brown's assets to the detriment of the charitable entity that Brown so fervently desired. Because he knew that it would be a source of dispute, Brown went to remarkable lengths to protect his right to designate the appropriate legacy for his life's work, including having numerous provisions in his estate documents and informing family members of his intentions in advance. We see no reasonable or substantial basis to support a good faith finding here.[21] *See Anderson v. Anderson*, 380 Ill. 488, 44 N.E.2d 43, 47 (1942) ("[T]here must be some reasonable or substantial basis for the claims advanced by the parties which are surrendered by the agreement."); *Russell*, 353 S.C. at 220, 578 S.E.2d at 335 (finding evidence of the testator's "unhampered opportunity" to change his will negated any undue influence that the appellants put forth); *cf., e.g., Estate of Cumbee*, 333 S.C. at 672–73, 511 S.E.2d at 394–95 (holding the determination that the testator's will was the product of undue influence was supported by the evidence, which showed the testator's conversations were overheard using a baby monitor, the testator developed hand signals to communicate with her visitors, the beneficiary had the testator's power of attorney and managed all of her finances, and that same beneficiary controlled the execution of the will).

---

21. Knowing of the potential for an attack on his estate plan after his death, Brown had admonished all potential challengers to his will and trust that such actions would "be considered an affront to [his] wishes."

The AG acknowledged during oral arguments in this matter that he undertook no inquiry into the undue influence claims of the Respondents and the circumstances surrounding Brown's execution of his will. While we do not believe a full-blown, formal investigation is required before a compromise may be reached, we believe something more than a mere accusation and the subjective opinion of the Respondents is necessary to justify court approval of a compromise that seeks to vitiate the decedent's entire estate plan on the basis of a vague allegation of undue influence. *Cf. Russell,* 353 S.C. at 220, 578 S.E.2d at 335 (noting "the circumstances surrounding the execution of the Will ... is the critical issue when evaluating an undue influence case"); *In re Last Will and Testament of Smoak,* 286 S.C. 419, 427, 334 S.E.2d 806, 810–11 (1985) (stating a witness's testimony that the will was the result of undue influence was a conclusion "obviously drawn out of thin air" as the witness "knew absolutely nothing about the circumstances under which the Will was executed"; the court noted "one of the basic rights known to our civilization is the privilege of disposing of property by Will as one elects").

As to the spousal claims, even if Tommie Rae were able to establish a claim as Brown's surviving spouse, she executed a prenuptial agreement, in which she indicated that she had the opportunity to consult with counsel of her own choosing and waived all rights to Brown's property or any statutory claims against his estate. A valid prenuptial agreement would normally preclude any right to an elective share. *See* S.C.Code Ann. § 62–2–204 (2009) ("The right of election of a surviving spouse ... may be waived ... by a written contract ... signed by the party waiving after fair disclosure."). She also executed an agreement waiving any claim to status as a common-law spouse.[22] Although the circuit court correctly noted the agreement to waive any claim as a common-law spouse would not be dispositive of Tommie Rae's claim that she was a surviving spouse, the circuit court did not acknowledge the sizeable bar posed by a prenuptial agreement.

---

22. Tommie Rae's waiver of any claim for status as a common-law wife begs the question of the necessity to do so if she was, in fact, the legal spouse of Brown. Moreover, the timing of the waiver raises additional questions because it arose from Brown's filing of an annulment action.

Beyond this, Brown's testamentary documents state that he was specifically omitting any other beneficiaries or potential beneficiaries, including a future spouse or heirs, based on his desire to leave most of his estate to charity after providing for the education of his grandchildren. *See* S.C.Code Ann. § 62–2–301(a) (2009) (providing an omitted spouse is not entitled to a statutory share where "(1) it appears from the will that the omission was intentional; or (2) the testator provided for the spouse by transfer outside the will and the intent that the transfer be in lieu of a testamentary provision is shown by statements of the testator or from the amount of the transfer or other evidence").

As for the claim of the pretermitted child, we note it was not supported by a properly-authenticated DNA test, even though one had been offered to Tommie Rae for her child, and Brown himself had previously requested a DNA test during his relationship with Tommie Rae.[23] The child was not born of the marriage, which is certainly not required for a pretermission claim, but this fact does mean that he does not enjoy a presumptive status as Brown's child, which would have been a significant factor supporting the finding of a good faith claim.

Moreover, as recognized by the circuit court, an omitted child is not entitled to a statutory share if "it appears from the will that the omission was intentional" or "the testator provided for the child by transfer outside the will and the intent that the transfer be in lieu of a testamentary provision is shown...." S.C.Code Ann. § 62–2–302(a)(1), (3) (2009). In light of the strong language in Brown's will that his failure to provide for any other person "claiming, *or to claim*, to be an heir" was "intentional and not occasioned by accident of mistake," we think this claim has some weakness, although it presents a closer question. (Emphasis added.) We do not believe, however, that this claim involving only one party can single-handedly validate the tenuous and unrelated claims of all of the remaining parties so as to justify the finding of a good faith controversy.

---

**23.** There was a test performed, but the testing lab stated in its report that it could not verify the accuracy of the results because the samples were not submitted in accordance with established protocol ("The samples were not collected according to AABB guidelines and the laboratory cannot verify the origin of the DNA samples.").

In sum, we question whether the claims were asserted in good faith since the primary claim asserted by the parties as a basis for discarding Brown's testamentary documents, undue influence, was of dubious validity. There was also a major impediment to Tommie Rae's spousal claim that undermines confidence in the court's finding of a good faith controversy. We further find the circuit court's statement that the totality of the claims supported a good faith finding is unpersuasive, as it is based on the assumption that each claim met some threshold level of viability. To the contrary, we do not believe the cobbling together of tenuous claims can be the basis for a good faith finding that would justify the drastic results sanctioned here. *See* 80 Am.Jur.2d *Wills* § 982 (2002) (stating "a court may decline to approve or enforce a settlement agreement which does not settle a 'good faith contest or controversy,' as where an agreement seeks only to set aside an otherwise valid will. In other words, a family settlement agreement may fail for lack of adequate consideration when there is lack of a reasonable or substantial basis for any claims surrendered by it." (footnotes omitted)).

### (b) Requirement of a Just and Reasonable Agreement

■ Appellants further argue that, even if the compromise was of a bona fide challenge to the will, it was not just and reasonable, which would preclude court approval under the statutory standard.

In addition to the presence of a good faith controversy between the parties, the ruling court must find "the effect of the agreement upon the interests of persons represented by fiduciaries or other representatives is just and reasonable[.]" S.C.Code Ann. § 62–3–1102(3). Both parts of the two-part test must be satisfied to warrant approval of a compromise agreement. *In re Estate of Schroeder,* 441 N.W.2d 527 (Minn. Ct.App.1989); *see also In re Estate of Birch,* 50 A.D.2d 475, 378 N.Y.S.2d 792, 797 (1976) (stating where a necessary requirement for a compromise agreement is lacking, the agreement may not be approved). Even assuming a good faith controversy existed among the parties, we agree that the compromise should not have been approved because the record does not indicate that the second element of the two-part test has been met.

Our state statute does not explicitly provide a standard for determining whether a compromise is "just and reasonable," nor does the Uniform Probate Code. A similar observation was made by the Minnesota Court of Appeals, which ultimately "conclude[d] that to be just and reasonable, an estate plan in a settlement agreement must defer to the testator's intent unless a departure from that intent is reasonably necessary to protect the interests of the beneficiaries." *Schroeder*, 441 N.W.2d at 533 (citing Fratcher, IV *Scott on Trusts* § 337.6 (4th ed.1989)). The Minnesota court noted this is consistent with the statutory scheme and it is also implied by a comment to the Uniform Probate Code, which states, "The only reason for approving a scheme of devolution which differs from that named by the testator or the statutes governing intestacy is to prevent dissipation of the estate in wasteful litigation." *Id.* (quoting Comment, Uniform Probate Code, 8 U.L.A. § 3–1102 (1983)). The court observed an estate plan in a settlement agreement may affect a trust; "[h]owever, an estate plan which differs from the testator's intent can be approved only in limited circumstances." *Id.*[24]

In *Schroeder*, the court found the decedent had clearly expressed her intent in a will executed with the requisite formalities and that the respondents had brought a frivolous will contest in a collusive move to destroy a trust created by the decedent. *Id.* at 534 (citing Bogert, *Trusts* § 152 (6th ed.1987)). The appellate court found "[t]o approve such a settlement agreement threatens to unravel two fundamental principles of probate law: (1) the paramount importance of carrying out the intention of the testator, and (2) the requirement that a testator express his intention with the requisite formalities." *Id.*

In determining that the settlement in the current appeal was just and reasonable, the circuit court observed there could be a potential beneficial effect if a marital deduction was obtained and further stated that, in addition to dropping their claims, the settling parties had, as part of the compromise, signed over their federal copyright termination rights. The

24. A compromise approved by the court "is binding even though it may affect a trust or an inalienable interest." S.C.Code Ann. § 62–3–1101 (2009).

circuit court found these rights could be a significant benefit
for the charitable beneficiaries because they might form a
substantial portion of the future value of the estate. There
was, however, no evidence presented as to the potential value
of these rights that could be compared to the potential value
the Respondents would obtain by having Brown's testamenta-
ry plan voided.[25] The court also opined that the settlement
was necessary to protect the charitable trust from the threat
of litigation.

In our view, the evidence does not support the finding that
the compromise was just and reasonable. The compromise
orchestrated by the AG in this case destroys the estate plan
Brown had established in favor of an arrangement overseen
virtually exclusively by the AG. The result is to take a large
portion of Brown's estate that Brown had designated for
charity and to turn over these amounts to the family members
and purported family members who were, under the plain
terms of Brown's will, given either limited devises or excluded.

Even if a good faith controversy had existed, the remedy
more appropriately would have been the reformation of the
documents to provide for any monies payable, not the total
dismemberment of Brown's carefully-crafted estate plan and
its resurrection in a form that grossly distorts his intent. We
find the compromise proposed here is fundamentally flawed
because the entire proposal is based on an unprecedented
misdirection of the AG's authority in estate cases. We also

---

**25.** The parties submitted a legal article indicating the copyright termi-
nation rights, or recapture rights, could be valuable, but the majority of
the article focused on the inherent difficulties in obtaining these rights.
As the author observed: "So complicated and borderline byzantine are
these requirements that leading copyright commentators have charac-
terized a successful termination of a copyright grant as a feat 'accom-
plished against all odds.'" Peter Afraslabi, *Superman's Latest Episode:
The Rights of Authors and their Families to Terminate a Copyright Grant
and Recapture the Copyright,* Orange County Lawyer, Sept. 2008, at 37
(quoting *Patry on Copyright* § 752 (2007)). This consideration, together
with the fact that it could take decades for some of these recapture
rights to become available, makes their potential value as compared to
any settlement amounts unclear. Moreover, the record also contains a
proposal from an Atlanta firm regarding Brown's estate in June 2007,
in which it stated the value of Brown's estate had three major compo-
nents: (1) likeness/publicity, (2) property, and (3) Brown's music cata-
logue, of which it indicated Brown's publicity rights, not the music
rights, were the most valuable.

believe that a departure from the testator's intent is not reasonably necessary to protect the beneficiaries' interests because any alleged advantage to them occasioned by the avoidance of further litigation, as propounded by the settling parties, is illusory at best.

"A will is an expression of a testator's intent to dispose of the testator's property after death." *In re Estate of Pallister*, 363 S.C. 437, 448, 611 S.E.2d 250, 256 (2005). The right to make a will directing the ultimate disposition of one's property is one of the basic rights known to our civilization, and it encompasses the right to make it according to the testator's pleasure and in his absolute discretion, whether judiciously or capriciously, justly or unjustly, subject only to the restraints upon the power of disposition that the law has imposed. *In re Last Will and Testament of Smoak*, 286 S.C. 419, 427, 334 S.E.2d 806, 811 (1985) (citation omitted); *see also Mock v. Dowling*, 266 S.C. 274, 278, 222 S.E.2d 773, 775 (1976) ("It is elementary that the statutory right of a competent person to dispose of [his] property as [he] wishes may not be thwarted by disappointed relatives or by one who thinks the [testator] used bad judgment or was misled.").

The law generally favors an agreement of compromise among family members to avoid a will contest or to promote the settlement and distribution of an estate. *Duncan v. Alewine*, 273 S.C. 275, 255 S.E.2d 841 (1979); *Dibble v. Dibble*, 248 S.C. 165, 149 S.E.2d 355 (1966); *see also In re Estate of Yeley*, 959 N.E.2d 888, 894 (Ind.Ct.App.2011) ("[T]he settlement agreement is a contractual agreement to transfer and distribute property among the parties so as to avoid litigation."). However, "[a] settlement agreement must defer to the testator's intent unless departing from his intent is reasonably necessary to protect the beneficiaries' interests." *In re Estate of Sullivan*, 724 N.W.2d 532, 535 (Minn.Ct.App.2006).

In granting the AG's Motion to Intervene, to which no objections were interposed, the circuit court ruled the AG was authorized to intervene pursuant to his *parens patriae*, statutory, and common law authority. The AG undoubtedly has the authority to intervene to protect the public interest of a charitable trust. However, the AG has no authority to become completely entrenched in an action that began here as

one to set aside a will and for statutory shares, direct the settlement negotiations, and then fashion a settlement that discards Brown's will and his 2000 Irrevocable Trust and replaces them with new trusts, only to give himself sole authority to select the managing trustee. By so doing, the AG has effectively obtained control over the bulk of Brown's assets and has given his office unprecedented authority to oversee the affairs of the parties that has not heretofore been recognized in our jurisprudence.

■■■ "The role of the Attorney General is as an overseer of charities representing the public, the ultimate beneficiary of the charitable trust." *In re Estate of Horton,* 11 Cal.App.3d 680, 90 Cal.Rptr. 66, 68 (1970) (citation omitted). "His duty is to remedy abuses in trust management." *Id.* (citation omitted). However, the AG is not "in the position of a super administrator of charities with control over, or right to participate in, the contractual undertakings of the charities." *Id.*

In discussing the duties of the attorney general as the protector, supervisor, and enforcer of charitable trusts, one treatise observes: "As an adjunct to his enforcement powers, the Attorney General is frequently granted powers of supervision and investigation regarding the administration of charities. However, ... in the absence of a statute, this power does not extend to the continuous oversight of a charity's administration when the settlor's intent is clear and there is no allegation of actual or threatened breach [of trust by a charitable trustee]." Ronald Chester, George Gleason Bogert, George Taylor Bogert, *The Law of Trusts and Trustees* § 411, at 25–26 (3d ed.2005).

■■■ "[I]t is axiomatic that a trustee is always under the direction and guidance of the court...." *Kingdom v. Saxbe,* 161 N.E.2d 461, 466 (Ohio, Ashtabula County Prob. Ct.1958). Although the AG certainly has duties in regards to charitable trusts, if he believed Appellants, as trustees, were not good stewards, the remedy would be to seek their removal and replacement. Brown's 2000 Irrevocable Trust contained a detailed procedure for the succession of trustees that was gutted and replaced with provisions allowing the AG the sole authority to select the managing trustee and to serve at his

pleasure.[26] *Cf. In re Estate of Ward,* 200 Ariz. 113, 23 P.3d 108, 112 (Ct.App.2001) ("The remedy for bona fide problems with the trustee is not rewriting a will or trust but replacing the trustee with a new trustee....").

Although the stated justification for the compromise was to avoid the potential of a substantial threat to the charitable beneficiaries occasioned by Respondents' claims, the compromise condoned by the AG here results in an outright gift of half of the estate to the family members and purported family members who challenged Brown's will and trust based on tenuous claims. As the enforcer of charitable trusts, we believe the AG's efforts would have been better served in attempting to make a cursory evaluation of the claims rather than directing a compromise which ultimately resulted in the AG obtaining virtual control over Brown's estate. Based on all the circumstances, we do not believe the effect of the compromise is just and reasonable, and we cannot condone its approval.

## C. Removal of Appellants as Personal Representatives and Trustees

Appellants next argue the circuit court erred in removing them from their fiduciary positions.[27]

■ Appellants assert the circuit court removed them without complying with the procedures outlined in sections 62–3–611 (removal of personal representative), 62–3–614 (appointment of special administrator), or 62–3–616 (powers and duties

---

26. Brown's trust agreement provided that, upon notice a trustee would no longer serve, the remaining trustees were to select a successor, and if they did not timely do so, the obligation fell to the advisory board. If that also failed, then the selection was to be made by the court with jurisdiction over the trust.

27. Appellants further argue the circuit court erred in ordering them to sign the compromise agreement, since their removal was effective "immediately." Appellants' argument in this regard is now moot based on our holding the circuit court erred in approving the compromise agreement in the first instance, as their signatures are effectively nullified by our ruling. As a general matter, however, we find no error in a court directing fiduciaries to sign a compromise while ordering their removal, as it is understood the acts are to proceed in logical sequence.

of special administrator) of the South Carolina Code, and no statutory ground was claimed or found justifying the removal of Appellants as trustees as required by section 62–7–706 (removal of trustees).

Section 62–3–611 governs removal of a personal representative. Subsection (a) provides "[a] person interested in the estate may petition for removal of a personal representative for cause at any time" and requires a hearing to be held after notice. S.C.Code Ann. § 62–3–611(a) (2009).[28] Subsection (b) provides "[c]ause for removal exists when removal would be in the best interests of the estate. . . ." *Id.* § 62–3–611(b).

Respondents contend the circuit court took up the issues related to Appellants' removal at the hearing to consider whether it should approve the settlement agreement; thus, a hearing and the opportunity to be heard was afforded to Appellants. Further, all of the settling parties petitioned the circuit court for Appellants' removal well in advance of the hearing, thus providing adequate notice. In addition, the circuit court found an irreconcilable conflict existed between Appellants and the settling parties because Appellants had expressed continuing opposition to their actions. Thus, the circuit court had cause to remove them and replace them with a professional fiduciary.

We find the circuit court did not violate the statutory provisions regarding the removal of personal representatives. Notice and a hearing were provided, and the court had cause to remove them as it was in the best interests of the estate. While we ultimately agree with Appellants in the specific conflict over the compromise agreement, we note the parties remained at odds over the handling of Brown's estate matters.

We are also aware that Appellants have sought $5 million in fees for their services as fiduciaries for a relatively short interval of time. In addition, Appellants sought and obtained permission from the circuit court to sell iconic assets from Brown's estate in order to raise funds, and a large portion of the amount raised went first to pay Appellants' own attorneys' fees. Appellants also unsuccessfully attempted to sell Brown's GRAMMY award at auction; the process was halted only

---

**28.** Section 62–3–611(a) was subsequently amended, but the change is not relevant to these proceedings. Act No. 244, 2010 S.C. Acts 1764.

because officials from the National Academy of Recording Arts and Sciences reclaimed the award after informing Appellants that it was a longstanding policy that the award could not be sold by recipients or anyone acting on their behalf. These actions and the extreme discord between the parties convince us that Appellants' continued service as fiduciaries is not in the best interests of the estate.

As to section 62–7–706, regarding the removal of trustees, this provision is cited once by Appellants, but it is not otherwise discussed. *See* S.C.Code Ann. § 62–7–706 (2009). Thus, Appellants have set forth no issue in this regard for the Court's consideration. *See Houck v. State Farm Fire & Cas. Ins. Co.*, 366 S.C. 7, 620 S.E.2d 326 (2005) (observing an argument is effectively abandoned if the appellant's brief treats it in a conclusory manner). The other provisions cited by Appellants concerning the appointment and duties of a special administrator likewise afford no basis for relief here. *See* S.C.Code Ann. §§ 62–3–614, –616 (2009).

We hold Appellants have shown no error in the circuit court's ruling removing them from their fiduciary positions. However, in light of our decision invalidating the compromise agreement, we likewise void Bauknight's appointment, which was made in conjunction with the settlement agreement, and under which he was to serve at the pleasure of the AG.[29] The circuit court should, upon proper application, appoint fiduciaries to oversee these matters in accordance with the provisions for succession outlined in Brown's trust and estate documents. The circuit court may consider at that time whether Bauknight should be appointed to fill a fiduciary position.[30] In

29. The probate court appointed Bauknight to serve as a Special Administrator, but only until the "various orders related to the removal of the former Personal Representatives and the appointment of Russell Bauknight as Personal Representative have been finally concluded."

30. We note the AG and/or Bauknight have allegedly entered into contingency-fee agreements with outside counsel, Kenneth Wingate, for Wingate to sue Appellants on behalf of the State, Bauknight, and others while also representing private plaintiffs in the suit. We are aware that a suit has been filed in Richland County seeking damages to Brown's estate allegedly arising during Appellants' service as fiduciaries. Despite FOIA requests, the AG had refused to publicly release all of the documents pertaining to this reported arrangement. However, the AG has recently informed this Court, in petitions filed after this Court's

addition, the circuit court shall also review the propriety of all fees, including attorneys' fees and trustees' fees, paid in relation to this action, and shall order all unearned fees or unapproved fees to be disgorged and returned to Brown's estate.

## III. CONCLUSION

The circuit court did a commendable job in attempting to sort out this difficult situation, but after considering the record and evaluating the positions of the numerous parties who seek a share of Brown's estate, we conclude the settlement reached in this case was not a fair and just resolution of a good faith controversy and that court approval is not appropriate.

The agreement served to transfer a large portion of the estate assets to persons who had been specifically excluded from Brown's will, in contravention of his stated desires. Throughout the record, it is clear that Brown's oft-repeated intent was to leave the bulk of his estate to charity for the education of needy children, as well as to provide up to $2 million for the education of his own family members. The settlement plan subverts that stated desire. The settlement provisions allowing the AG to select the trustee, and his continued influence over the trust overreaches his statutory authority, as there is no provision allowing an AG to become involved in the day-to-day operations of a trust. Moreover, the AG's primary job is the enforcement of charitable trusts, and in this case, the compromise dismantles the existing charitable trusts, to great ill effect on Brown's estate plan, rather than enforces it. These facts all demonstrate that the agreement should not be condoned by this Court, and we reverse the circuit court's finding to the contrary.

We affirm the circuit court's removal of Appellants from their fiduciary positions, and, in light of our decision invalidating the circuit court's approval of the compromise agreement, we likewise void the appointment of Bauknight. We direct the circuit court, upon proper application, to appoint fiduciaries to oversee these matters in accordance with the provisions of

initial opinion, that he is now withdrawing as a party in that lawsuit and his office will maintain a monitoring role.

Brown's estate and trust documents, and to evaluate the propriety of all fees, as specified above, that are related to this case.

Based on the foregoing, the order of the circuit court is affirmed in part and reversed in part, and the matter is remanded to the circuit court for further proceedings in accordance with this decision.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

KITTREDGE and HEARN, JJ., and Acting Justice JAMES E. MOORE, concur. TOAL, C.J., concurs in a separate opinion.

Chief Justice TOAL.

I concur in nearly all of the majority's excellently re-searched and learned opinion, with the exception of the finding regarding the removal of the court-appointed fiduciaries. I continue to hold the opinion that the court ordered fiduciaries Pope and Buchanan should have been retained. However, in light of the fact that the rest of the Court sees this issue differently, I agree with all of the directives and holdings contained in the majority opinion with respect to the further handling of these matters on remand. My agreement includes concurrence in our ruling that, on remand, the circuit court should decide who to appoint as fiduciary and should review all attorney and other fees and order all unearned or unap-proved fees to be disgorged and returned to Mr. Brown's estate. I also write separately to comment on what I view as the government's unprecedented encroachment into estate administration, which had we accepted it, would be the end of estate administration as we know it in this State.

As an initial note, I concur wholeheartedly in the portions of the majority opinion finding that the contestants had no good faith basis upon which to bring their claims against the estate and that the terms of the settlement were not just and reasonable. The effect of the circuit court's order is to allow a group of "beneficiaries" with highly questionable or completely invalid claims to agree with each other to receive benefits the testator chose to deny them without even having to take any

steps toward substantiating the validity of their claims or verifying the testator's incapacity. Had any steps been taken to verify their claims, I am of the opinion that the circuit court would have found all completely lacking in merit, which in turn would have lead to the disinheritance of every contestant of the will under the no-contest clauses contained in the estate documents. *See Russell v. Wachovia Bank, N.A.*, 370 S.C. 5, 633 S.E.2d 722 (finding no-contest clause was valid and enforceable where claims of undue influence lacked probable cause in that they did not represent a bona fide inquiry into the testators carefully drafted estate plans).[31]

While I agree with the majority that the purpose of a settlement agreement is not to litigate the merits of the claims against the estate, accusations in a complaint and inferences made from other fragmented facts in the Record cannot form the basis of a good faith controversy to invalidate an otherwise carefully drafted estate plan. Instead, courts must require the settling parties to put forward some "forecast of evidence indicating that at trial [they] would be able to show that a *bona fide* dispute existed as to the validity of the [estate provisions] in question." *Holt v. Holt*, 304 N.C. 137, 282 S.E.2d 784, 785 (1981); *see also O'Neil v. O'Neil*, 271 N.C. 106, 155 S.E.2d 495, 501 (1967) ("The record discloses no information as to the circumstances under which the 'Will' was drafted. Nor does the record indicate what inquiries, if any, have been made to determine what testimony the draftsman and the witnesses would give relevant to what occurred prior to and at the time of the execution of the 'Will.' "). Otherwise, it is impossible to say to that the claims were brought in good faith. Further inquiry is especially important, where, as here, it appears the contestants' chance of success on the merits was

---

31. We upheld Judge Russell's estate plan, including the no-contest clause because it could not be shown that Judge Russell lacked testamentary capacity or that his ability to make decisions of this nature had been overborn by others. Mr. Brown is entitled to the same treatment. Mr. Brown's estate plan, including its no-contest provisions, must be enforced because there has been no showing that he lacked testamentary capacity or that his will was overborn by others. If we will uphold a no-contest clause in Judge Russell's case, where the issue of capacity was actually contested, it is only just to uphold Mr. Brown's estate plan, including the no-contest provisions, where there was no real evidence-based challenge to Mr. Brown's capacity.

highly unlikely. Furthermore, any agreement sanctioning a windfall to these contestants which also simultaneously defeats Mr. Brown's express desire that one hundred percent of that money go to fund the educational pursuits of needy children cannot be just or reasonable.

The fact that the AG has agreed to the settlement is of no consequence, as the court is the ultimate arbiter of the merits of any settlement agreement devolving from a testator's express intent.

The AG has taken unprecedented action in this case. After effecting a total takeover of Mr. Brown's estate by excluding its trustees and banding together with parties who stand only to gain from the invalidation of the testator's devise, the AG disposed of the court-appointed trustees, created a new settlement entity, and inserted himself into the day-to-day operations of a newly created charitable trust, the Legacy Trust. Along the way, a seemingly carefully executed testamentary devise was completely disregarded without any sworn testimony that the document, itself, is somehow defective. In asking this Court to give our imprimatur to the settlement agreement, Respondents effectively asked us to dispense with the cardinal rule of trusts and estates law that the intent of the testator must prevail wherever possible. *See Johnson v. Thornton,* 264 S.C. 252, 257, 214 S.E.2d 124, 127 (1975) ("In determining this question we are guided by the rule that in construing the provisions of a will the intention of the testator is the primary inquiry of the court."); *Limehouse v. Limehouse,* 256 S.C. 255, 257, 182 S.E.2d 58, 59 (1971) ("The court's aim in construing a Will is to discover and effectuate the expressed intention of the testator."). Were we to accept the new estate plan, we would undermine any confidence citizens may have in their ability to do with their personal assets as they wish, leading to a chilling effect on future testators in South Carolina wishing to make charitable testamentary devises, as the result sought by the AG would permit him to become the effective "super member" of the boards of directors or trustees of these future testators' foundations whenever he chose to intervene in the administration of their estates. Evelyn Brody, *Whose Public? Parochialism and Paternalism in State Charity Law Enforcement,* 79 Ind. L.J. 937, 1034 (2004).

As outlined by the majority, four months after intervening in the action,[32] the AG convened a mediation in Augusta, Georgia, and intentionally excluded Appellants, the court-appointed fiduciaries of Mr. Brown's estate. During the ensuing negotiations, the AG purported to "settle" the claims against the estate by creating a new estate plan, under which nearly fifty percent of the residuary estate, which Mr. Brown left entirely to the Charitable Trust for the education of needy children, was now divided between some of Mr. Brown's adult children and his purported spouse. In settlement of these parties' claims against the estate, the AG and these family members created a new charitable trust, the Legacy Trust. The AG gave himself sole authority to select, remove, and replace the managing trustee of the Legacy Trust.[33] Furthermore, the disinherited children and putative wife of Mr. Brown were authorized to select a trustee from whom the managing trustee would seek input and advice when managing the Legacy Trust.

In approving the settlement agreement, the circuit court observed:

When the [AG] does appear in litigation involving a charitable trust either by motion for intervention or being brought in by an amendment to the pleadings, he has a right to take charge and control that portion of the litigation which relates to the charitable trust ... This authority that allows the [AG] to control the litigation also provides that the [AG] has exclusive authority, in order to protect the public interest, to settle or compromise litigation....

Therefore, it is for the [AG], as the officer charged with the duty of protecting charitable beneficiaries, to exercise his discretion as to the appropriateness of a settlement. It is

---

32. Everyone agrees that the AG's initial intervention was proper amidst allegations of fraud and misappropriations of the trust funds by the original trustees, Bradley, Dallas, and Cannon.

33. In fact, the settling parties represented to the circuit court that under the settlement agreement, "there will be a replacement of the currently serving personal representatives and trustees with a managing trustee who will be controlled completely by the attorney general of South Carolina" and that "the [AG] under the documents has full power to remove and replace any trustee serving ... as trustee of the ... Legacy Trust."

the responsibility of this Court in reviewing the record to determine if the [AG] acted in good faith [in] entering in this compromise agreement.

(citations omitted).

This is a gross misstatement of AG's authority. While the circuit court ultimately approved the settlement, in my view, this erroneous statement of law suggests that the circuit court did not engage in meaningful independent review of the settlement because the court wrongly assumed that the AG had discretion to settle the estate, with the court merely required to "rubber-stamp" any agreement presented to it by the AG.

It goes almost without saying that the AG, like the attorneys general of most states, has common law and statutory authority to enforce trusts domiciled in the State of South Carolina. *See* S.C.Code Ann. § 1–7–130 (Supp.2011).[34] The precedents relied upon by the circuit court and cited by Respondents are in line with this position and stand for the proposition that the attorney general is the appropriate party to "protect the interests of the public at large in the matter of administering and enforcing charitable trusts." *Epworth Children's Home v. Beasley,* 365 S.C. 157, 163 n. 3, 616 S.E.2d 710, 713 n. 3 (2005) (citing *Furman Univ. v. McLeod,* 238 S.C. 475, 482, 120 S.E.2d 865, 868 (1961)).

*Epworth* and *Furman* are foundational in that they define the role of an attorney general in our state jurisprudence; however, these cases cannot be read as broadly as Respondents urge. In my view, these cases illustrate the traditional role of the AG's enforcement and oversight role in charitable trust administration, but do not grant the AG a "blank check" authorizing the AG to do what he will when it comes to charitable enforcement. Under the traditional model, the role of an attorney general in overseeing charitable entities is "limited . . . to ascertaining that trustee actions are permitted by, and not inconsistent with, the underlying trust instrument, and safeguarding against fraud." Mark Sidel, *The Struggle*

---

**34.** I note that this power to enforce the trust is not *exclusive. See* S.C.Code Ann. § 62–7–405(c) ("The settlor of a charitable trust, *the trustee,* and the Attorney General, among others may maintain a proceeding to enforce the trust." (emphasis added)).

*for Hershey: Community Accountability and the Law in Modern American Philanthropy,* 65 U. Pitt. L.R. 1, 2 (2002); cf. 1 S.C. Jur. Attorney General § 14 ("The Attorney General is charged with responsibility for enforcement of the due application of funds given or appropriated to public charities within the State of South Carolina. He is responsible for the prevention of breaches of trust in the administration of public charities. His duty is to protect the interests of the public at large rather than those who may have an immediate or peculiar interest in a charitable trust." (footnotes omitted)). This traditional oversight role, contrary to the AG's view, "does not include . . . a right to direct either the day-to-day affairs of the charity or the action of the court." *Id.* at 32 (citation omitted).[35]

This viewpoint is very much in line with other state court and scholarly opinions. For example, in *Midkiff v. Kobayashi,* 54 Haw. 299, 507 P.2d 724, 745 (1973), the Hawaii Supreme Court aptly described an attorney general's role in charitable trust administration as follows:

> The function of the attorney general, as *parens patriae* of charitable trusts, is to oversee the activities of the trustees to the end that the trust is performed and maintained in accordance with the provisions of the trust document, and to bring any abuse or deviation on the part of the trustees to the attention of the court for correction. The authority of the attorney general over charitable trusts does not extend beyond the performance of that function.

(internal citations omitted).[36]

Of course, this view of the AG's supervisory powers, embodied in reporting requirements and other oversight and investi-

---

**35.** The facts of both *Epworth* and *McLeod* exemplify the valid exercise of attorney general enforcement power. In *Epworth,* 365 S.C. 157, 616 S.E.2d 710, the trustees wished to terminate the trust in a manner that was violative of the settlor's intent, and the attorney general intervened to protect the charitable trust from destruction. In *McLeod,* 238 S.C. 475, 120 S.E.2d 865, the attorney general was made a party to protect the public interest when trustees sought to deviate from the technical terms of the trust.

**36.** Importantly, the Hawaii Supreme Court found that the·attorney general did not have the authority to sanction trustee deviation from the provisions of the trust. *Id.* Instead, that court stated, "If a deviation

gative tactics, does not mean that the AG has *no* role to play when a charitable trust is involved. In *Estate of Horton*, 11 Cal.App.3d 680, 90 Cal.Rptr. 66, 68 (1970), the California court was presented with the question of how much involvement the attorney general should have in settlement negotiations involving several charitable entities and other beneficiaries of a testamentary trust. In approving the settlement agreement, the court defined the role of the attorney general as follows:

> The role of the Attorney General is as an overseer of charities representing the public, the ultimate beneficiary of the charitable trust.... His duty is to remedy abuses in trust management.... He is a necessary party to proceedings affecting the disposition of the assets of a charitable trust.... It is his right and duty to participate in proceedings to protect charitable gifts....

*Id.* (internal citations omitted). While the court found the attorney general "has undoubted standing to seek redress in the courts of contracts entered into by charities which are collusive, tainted by fraud or which demonstrate any abuse of trust management," the court also found that the attorney general could not assume "the position of a super administrator of charities with control over, or right to participate in, the contractual undertakings of the charities." *Id.; cf.* Mary Grace Blasko, Curt S. Crossley, David Lloyd, *Standing to Sue in the Charitable Sector*, 28 U.S.F. L.Rev. 37, 47 (1993) ("The

---

from any trust provision is necessary in the interest of the trust, the power to authorize the deviation rests solely with the court." *Id.* Our facts are slightly different, but I think the import of this statement rings true in the present controversy, as the circuit court, in approving the AG's settlement agreement, wrongly assumed that the AG had total control over the litigation, and thus the court's approval was a foregone conclusion. The Respondents repeatedly proclaimed to the court that they sought court approval of the agreement not out of legal necessity, but as a matter of course, because court approval of a private settlement agreement was not essential to its validity. In my view, in any instance where any party desires to deviate from the express terms of a testamentary trust, meaningful court review is required. *See, e.g., Brown v. Ryan*, 338 Ill.App.3d 864, 273 Ill.Dec. 307, 788 N.E.2d 1183, 1191 (2003) (citations omitted) (holding while "the community has an interest in enforcing the trust and the Attorney General represents the community in seeing that the trust is properly construed and that the funds are applied to their intended charitable uses[,]" the state could not "compel the court to terminate the trust and end the relationship between the Trustees and the Trust *corpus*.").

attorney general does *not* ... have a right to regulate the actions of a charity or to direct its day-to-day affairs. Courts have denied the attorney general authority to intervene in suits contesting wills involving charities, to enforce obligations owing to charities, to intervene or appear for the establishment of an invalid charitable trust, or to authorize deviations from trust provisions." (emphasis in original) (footnotes omitted)).

While no one disputes the propriety of the AG's initial intervention amidst allegations of fraud by the original trustees, once the court appointed Pope and Buchanan as fiduciaries, the AG's involvement was no longer necessary to stave off maladministration of the Charitable Trust. At that point, the AG should have assumed a more passive role. Carl Schramm, *Law Outside the Market: The Social Utility of the Private Foundation*, 30 Harv. J.L. & Pub. Pol'y 355, 372–73 (2006) ("In general ... government oversight is premised on a view of nonintervention in the substantive decision-making and operations of foundations.... 'With few exceptions, the law neither attempts to control the decisions of managers, made in good faith, as to how the purposes will be achieved, nor how their organizations will be administered.' Generally, a state attorney general can pursue legal action against foundations in cases where charitable assets are in jeopardy (thus possibly violating donor intent), and in cases involving illegal actions." (quoting Waldemar A. Nielsen, *The Golden Donors: A New Anatomy of the Great Foundations* 13, 110 (1985))).

Instead, the AG took it upon himself to discontinue the court-appointed trustees' administration of the trust in accordance with their fiduciary responsibilities by settling the claims against the estate, and then proceeded to create an entirely new estate plan in which he has a direct role in the management and day-to-day operation of the Charitable Trust through the appointment, at will, of the managing trustee. Thus, the AG impermissibly crossed "the line between oversight and management" in this case. Brody, *supra*, at 974. Absent any claims of fraud or mismanagement, the trustees should have been permitted to probate the will in accordance with its terms or engaged in any settlement negotiations they deemed necessary to protect the assets of the estate. *Cf. Murphey v. Dalton*, 314 S.W.2d 726, 730–31 (Mo.1958) ("And trustees of a public charitable trust, like trustees of a private

trust, may bring actions against third persons to recover or preserve or protect the trust assets and may bring suits for instructions, and it should follow that they may take any reasonable action (including the defense of a will contest suit) necessary to uphold the validity of the trust established by a will and thereby protect and preserve the trust assets ...".). When the AG hijacked the proceedings here, the case was nothing more than a run-of-the-mill will contest (aside from the size of the estate).[37] The AG had no authority to act as the lawyer for the trust or the trustees by entering into this settlement agreement at the exclusion of the rightful fiduciaries. *See Murphey,* 314 S.W.2d at 730–31 (finding the trustee was empowered to hire outside counsel to defend a will contest and stating "the attorney general as the attorney for the public is not the attorney for the trustee of a public charitable trust who was appointed by the settlor, and that when and under what circumstances the attorney general is a necessary or proper party to a will contest or to any other suit involving a public charitable trust or when and under what circumstances he should or must bring such action, has nothing to do with the right of a trustee to be represented by counsel of his own choosing." (internal citations omitted)).

Furthermore, as noted by the majority, the testamentary documents, which are the guiding indicator of a testator's

---

37. Indeed, I question whether the AG has any role to play in a will contest. *See Com. ex rel. Ferguson v. Gardner,* 327 S.W.2d 947, 949 (Ky.1959) ("The contention that the Attorney General should be permitted to intervene and participate as a party in the present type of will contest does not appeal to this court as being independently sound in principle. The object of the contest is to determine one issue, i.e. [sic], whether the papers probated are the last will and testament of Ed Gardner. If not, nothing was thereby devised, bequeathed, or created to go to charity, and there will be no administration to be supervised."); *Spang v. Cleveland Trust Co.,* 134 N.E.2d 586, 591 (Ohio Com.Pl.1956) ("The object of this will contest proceeding is to determine one simple issue: Whether the paper writing is the last will and testament of the testatrix. If it is found not to be, then it never was the last will and testament; and nothing was bequeathed or devised by it, and nothing was created by it. The object of the proceeding is not primarily, if at all, to terminate a charitable trust. The will contest proceeding may result in the *nonexistence* of a *purported* trust created by a paper writing, having no recognition in law as a conveyancing, assigning, transferring, bequeathing or devising instrument." (emphasis in original)).

460

intent, absent a *court* finding otherwise, conferred upon the trust, acting through its trustees, and upon the estate, acting through the personal representatives, the power to compromise claims. Trust, Art. X(19); Will, ITEM VI; *see also Bob Jones Univ. v. Strandell*, 344 S.C. 224, 230, 543 S.E.2d 251, 254 (Ct.App.2001) (citation omitted) ("In construing a will, a court's first reference is always to the will's language itself."); *Limehouse v. Limehouse*, 256 S.C. 255, 257, 182 S.E.2d 58, 59 (1971) ("The court's aim in construing a Will is to discover and effectuate the expressed intention of the testator. In searching for intention, however, we may not conjecture how the testator might have chosen to express himself had his mind adverted to the particular contingency. Circumstances known to the testator at the execution of his Will are an admissible aid in construing doubtful provisions, but the main recourse must be to the language used. We may not redraft the Will, nor may we doctor a crucial part." (internal citations omitted)). There has not been a finding by any court concerning the validity of the will or the trust instruments. Therefore, the plain language of the testamentary documents only reinforces Appellants' claim that the AG overstepped his authority in this case.

In sum, the Court has rightly decided that the AG simply does not possess the sweeping and unprecedented authority he assumed in this case, perhaps best illustrated by the dearth of case law supporting the AG's position in our own jurisprudence. The AG orchestrated the fabrication of an entirely new estate plan under the auspices of his power to intervene in the litigation when settlement negotiations in this case should have been undertaken (or not) by the trustees as the rightful fiduciaries of the charitable trust, and not the AG. The AG, absent claims of fraud or mismanagement, has no right to interfere in the operation of a validly created testamentary trust based solely on his statutory authority to enforce a charitable trust.

> Where discretion is conferred on a charity's board, proper state enforcement action over fiduciary decision making reduces to a single rule: The role of the attorney general and courts is to guard against charity fiduciaries' wrongdoing, and not to interfere in decision making carried out in good faith.... To this end, an attorney general is vested

with the authority to seek to correct breaches of fiduciary duty that have not otherwise been remedied by the board. However, the attorney general is not a "super" member of the board.

Brody, *supra*, at 1034.

Because the circuit court labored under the erroneous assumption that the AG had the right to control this litigation, failed to review the *bona fides* of the claims against the estate, and approved a settlement that was entirely unjust and unreasonable based on the dubious claims of the contestants, I would further find that the circuit court erred in removing Appellants as fiduciaries of the estate based on the recommendation of the settling parties.[38]

---

**38.** Nevertheless, I agree with the majority that the circuit judge, on remand, has the authority to review the propriety of Bauknight's continued service to the estate in a fiduciary capacity. I further join in the majority's directive that the circuit judge should proceed to review all fees awarded and requested up to this point in these proceedings, determine the appropriateness of such fees, and order the payment or the disgorgement of such fees based on his calculations.